731 F.2d 1076
 115 L.R.R.M. (BNA) 3297, 100 Lab.Cas. P 10,905
 Gerald KOBELL, Regional Director for Region 6 of the
National Labor Relations Board for, and on behalf
of, The National Labor Relations Board,
Petitioner-Appellant,
v.
SUBURBAN LINES, INC., Respondent-Appellee,
and
Shortway Airport Limousines, Inc. and/or Holland Industries,
Inc. and/or Shortway Airport Limousines, Inc.,
Respondent-Appellee,
General Drivers, Warehousemen, Helpers and Gas Station
Attendants Local No. 614 a/w International
Brotherhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of
America, Party in Interest.
 No. 83-5394.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 27, 1983.
Decided March 20, 1984.
As Amended March 28, 1984.
 
 Joseph P. Norelli, Margaret M. Dietz (argued), N.L.R.B., Washington, D.C., for petitioner-appellant.
 Allan L. Fluke (argued), Wick, Rich, Fluke & Streiff, Pittsburgh, Pa., Sanford E. Pollack, Martin Gringer (argued), Milman, Naness & Pollack, Hewlett, N.Y., for respondents-appellees.
 Before ALDISERT and BECKER, Circuit Judges, and POLLAK*, District Judge.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 I. Preliminary Statement
 
 1
 This case arises under section 10(j) of the National Labor Relations Act, 29 U.S.C. Sec. 10(j) (1976), which enables the National Labor Relations Board or its designated agent to seek interim injunctive relief from a federal district court pending the Board's own administrative adjudication of an unfair labor practice complaint.[1] As the jurisprudence has evolved, interim injunctive relief may be granted under section 10(j) without the showing of irreparable harm and a likelihood of success on the merits, which are the ordinary requisites for a preliminary injunction. Instead, a federal district court must merely find "reasonable cause" to believe an unfair labor practice has occurred and must determine that the relief sought is "just and proper."
 
 
 2
 In this case, Regional Director Gerald Kobell, as agent for the Board, contended before the district court that interim relief was required under section 10(j) to thwart a joint venture by a failing bus line and the company that took over its operations to divest themselves unlawfully of a particular union as the bargaining representative of their drivers.[2] After a three-day hearing, the district court denied the section 10(j) injunction because it found no reasonable cause to believe that a violation of the NLRA had occurred and because it concluded that it was not just and proper to grant relief. The Director appeals, and we affirm.
 
 
 3
 The appeal is complex and requires us to address difficult and important issues concerning the propriety of section 10(j) relief and the scope of appellate review over district court determinations in this field. It will therefore be helpful to sketch at the outset the manner in which the opinion will be developed.
 
 
 4
 We begin in Part II with a review of the evidence adduced at a hearing before the district court to show an alleged plot by appellee Holland Industries and its "Shortway" subsidiary to refuse discriminatorily to hire unionized employees of the operation it was assuming and thereby to evade the obligation that otherwise might well have existed to bargain collectively with the union those employees had previously elected as their representative. We then proceed in Part III to analyze whether the district court committed reversible error in finding no reasonable cause to believe that the defendants had committed unfair labor practices. This analysis shall sequentially entail (A) a discussion of the meaning of "reasonable cause" under section 10(j), (B) an examination of the scope of our review over district court determinations with respect to "reasonable cause," and (C) an application of that standard to the determination of the district court in this case. In this part we conclude that the district court's decision that no reasonable cause existed was reversible error.
 
 
 5
 We then proceed in Part IV to a similar analysis of whether the district court also erred in denying relief on grounds that it was not "just and proper." Here too our analysis begins with a discussion of the concept "just and proper," including a discussion of the broad purposes of section 10(j). We next examine the scope of our review over district court determinations that a given form of relief is not just and proper, and end this part of the opinion by applying the selected standard of review to the determination of the district court in the case.
 
 
 6
 We conclude that the district court did not abuse its discretion in finding that the relief requested by the Regional Director was not just and proper under the particular circumstances of this case. Accordingly, we will affirm the judgment.
 
 II. Facts
 
 7
 Since 1962, under operating authority granted by the Pennsylvania Public Utility Commission ("PUC"), appellee Suburban Lines has operated a charter bus service and a commuter bus service between Washington, Pennsylvania and Pittsburgh. Since 1969, the Amalgamated Transit Union, Local 1543 ("ATU") has represented Suburban's 38 drivers and mechanics and has entered into a series of collective bargaining agreements with Suburban.[3] The most recent agreement, which expired December 31, 1982, provided for wages averaging $8.60 per hour.
 
 
 8
 During 1981 and 1982, Suburban Lines did not fare well financially.[4] In April of 1982, J.C. Hilty, the president and general manager of Suburban (and owner of 77 of the 737 shares of its stock), answered a job advertisement in Bus Rider magazine placed by appellee Holland Industries. Holland is a New York and Toledo-based firm, which through several subsidiaries operates a number of bus lines throughout the nation. Many of these subsidiaries had collective bargaining agreements with local affiliates of the Teamster's Union at wage rates then averaging less than five dollars per hour. The record does not disclose what response, if any, Holland gave to Hilty's submission. It is apparent from the record, however, that prior to July 15, 1982, Holland must have communicated at least something to some responsible official of Suburban. On that date, at a meeting presided over by Hilty, the Suburban board of directors discussed an offer by Holland to purchase Suburban. While the minutes of that meeting, which are a matter of record, do not disclose the board's opinion of the Holland offer, there was at least discussion of a counteroffer being made to Holland and an estimate made of the liquidation value of Suburban's assets.
 
 
 9
 On August 9, 1982, several significant events occurred. First, an attorney for Suburban, acting as incorporator, filed articles of incorporation for "Short Way Suburban Lines, Inc.," a wholly owned subsidiary of Holland Industries. Second, the Suburban stockholders held a special meeting and voted to accept a plan of liquidation approved earlier that day by the Suburban board of directors. According to Francis Olczak, a union driver for Suburban and owner of 10 shares of its 737 shares of stock, Hilty stated at the shareholders' meeting that Shortway had agreed to hire him (Hilty) as manager but that Holland, the acquiring company, would not be hiring any of the Suburban drivers.[5]
 
 
 10
 There was also evidence produced at the evidentiary hearing before the district court from which it might be inferred that, while all of this was happening at the shareholder and director level of Suburban, Hilty began an effort to persuade or coerce the Suburban drivers into accepting the Teamsters as their bargaining representatives. According to testimony and an affidavit of Suburban driver Paul Phillips, Hilty told him that the new company would deal only with Teamsters.[6] Moreover, according to Olczak, Hilty told him on August 13 that Holland Industries "would deal only with the Teamsters Union," and that Holland would hire the Suburban drivers only if they would "go Teamsters." Olczak further testified that Hilty asked him to poll the other drivers to see if they would agree to changing their bargaining representative. Olczak testified that he complied with Hilty's request and that a week later he told Hilty that none of the other drivers would agree to switching their bargaining representative.
 
 
 11
 Evidence was also adduced that Holland Industries then decided that none of its Shortway employees would come from Suburban.[7] According to the testimony of Karl Thomas Wegerbauer, president of Holland Industries and of Shortway, this decision, which was reached sometime in early September, not to hire Suburban employees was not caused by any lack of applications from Suburban drivers.
 
 
 12
 On September 8 the Suburban board of directors met again. The directors approved sale of the company to Shortway for approximately one million dollars, twice the liquidation value estimated at the earlier July 15 meeting.[8] On September 14 the deal was finalized. Sale of the company, which was to take place on October 30, was contingent, however, on approval by the PUC of permanent transfer of Suburban's routes to Shortway. On September 15, the appropriate filings were made to the PUC in support of this transfer.
 
 
 13
 Between September 14 and October 30, Suburban and Shortway continued what the Regional Director regards as a clandestine and illegal venture to evade the obligations created by NLRB v. Burns International Security Services, Inc., 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972) and Howard Johnson Co. v. Detroit Joint Executive Board, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). Those cases impose a duty upon an employer who takes over a unionized operation and who conducts essentially the same business there as its predecessor to bargain collectively with the representative elected by the workers of the predecessor, provided that those workers constitute a majority of the successor's workforce. The Regional Director argues, in essence, that by discriminatorily refusing to hire Suburban employees--a plan accomplished by lying to them about when applications were due and when jobs were available--Shortway sought to evade its obligations under Burns and Howard Johnson and to rid itself of the high-priced ATU.
 
 
 14
 In support of this theory, the Regional Director notes that Holland/Shortway began hiring admittedly less experienced drivers in Detroit to take over operation of Suburban's Pennsylvania routes. According to uncontroverted testimony of Louis Keplar, Hilty--who arguably knew that Holland had already decided not to hire any Suburban drivers, see supra at 1080 --told Keplar in late September that the new company would be getting in touch with him and that "there was no reason to hound [Hilty] every day." Then, in early October, according to testimony from Suburban driver Phillips, Hilty told Phillips that the Suburban drivers would have jobs, though not for a month or so. According to testimony of Warren S. George, vice-president of the ATU, on October 15 Shortway attorney Sanford Pollack returned a telephone call and told George that, while Shortway was "presently training drivers in the Toledo/Detroit area for [the Pennsylvania] jobs," it would consider the Suburban drivers for subsequent openings. Pollack also sent George a letter dated October 19 containing job applications and stating, "We anticipate to begin operation with a complete staff and, therefore, see no urgent need in the return of the enclosed." What Pollack did not reveal was that Shortway had not yet completed its hiring for the Pennsylvania jobs; between October 15 and 25 Shortway hired five more drivers.[9] In sum, the Regional Director would have liked the district court to have found an illegal attempt to lull ATU members into a false sense of security and then to lie to ATU members--or at least speak recklessly--about the availability of employment.[10]
 
 
 15
 Meanwhile, the deal between Suburban and Shortway was running into difficulty. On October 29, following a hearing at which the ATU had lodged a protest against the proposed sale, the PUC directed Suburban not to abandon service pending the PUC's final decision on transferring operation of the bus routes to Shortway. Temporary authority for Shortway to operate the routes, which the PUC had granted on October 15, remained in force. Thus, at least until the PUC decided differently, Shortway could operate the routes. But until the PUC approved permanent transfer of the routes to Shortway, the September 14 agreement did not permit consummation of the sale of Suburban to Shortway.
 
 
 16
 Faced with the PUC obstacle, Shortway and Suburban executed a second deal on October 29. Under the new agreement, Suburban would lease its buses and equipment to Shortway in return for a fixed rental. The lease would last as long as Shortway had temporary authority to operate the Suburban routes. Shortway began operations the next day. It also recognized the Teamsters as the bargaining representative for its employees. The Teamsters and Shortway agreed that the Shortway drivers would operate under a collective bargaining agreement in effect with another Holland subsidiary. Wages under this collective bargaining agreement averaged $4.80 per hour, considerably less than that paid by predecessor Suburban to the drivers, who were affiliated with the ATU.
 
 
 17
 Between November 1, 1982, and January of 1983, a rather curious event occurred: Shortway fired or transferred back to Detroit 27 of the 31 drivers it had originally hired.[11] It has since hired four of the former Suburban employees.
 
 
 18
 Formal legal proceedings challenging the propriety of the events described above began on November 9, 1982, when the ATU filed an unfair labor practice charge with the NLRB. After an investigation, the NLRB, acting through Regional Director Kobell, filed an unfair labor practice complaint against the defendants. The complaint, dated December 30, 1982, accused them of violating sections 8(a)(1), 8(a)(2), 8(a)(3), 8(a)(4), and 8(a)(5) of the NLRA. 29 U.S.C. Secs. 158(a)(1)-(5). Three months later, on March 4, 1983, the Regional Director petitioned the district court for the Western District of Pennsylvania for interim injunctive relief under section 10(j).[12] The Regional Director requested, among other items, that the district court order the bus companies to make reinstatement offers to the displaced Suburban drivers, that the bus companies be required to recognize the ATU as the bargaining representative of the employees driving the old Suburban routes, and that the collective bargaining agreement between Suburban and the ATU be reinstated as governing the terms and conditions of the current employees.
 
 
 19
 The district court held three days of hearings on the complaint (April 18, 19 and 20) during which it heard testimony from fifteen witnesses called by the Director. The bus companies moved at the close of the Director's case for a directed verdict (or for the dismissal of the complaint). On April 20, 1983, the district court granted the bus companies' motion and dismissed the Regional Director's petition for interim injunctive relief.
 
 
 20
 Although the grounds upon which the district court dismissed the complaint will be taken up in detail below, they may be summarized as follows. First, while not specifically finding any of the testimony mentioned above to lack credibility or relevance, the district court nonetheless held that there was no reasonable cause to believe that an unfair labor practice had occurred. Although accepting arguendo (1) that the employees of the new company were less competent than the old Suburban employees; (2) "that the new owners of the bus line did not encourage the former employees to seek employment; " and (3) that "the former employees may have been confused as to how to go about applying," the district court nonetheless stressed that Shortway had never actually refused to hire any Suburban applicant. The district court also suggested that the old Suburban employees would not have been willing to work at the Shortway wage rates anyway and further held that there was no showing that anti-union animus solely motivated Shortway.
 
 
 21
 As a further basis for denying interim injunctive relief, the district court held that the relief sought by the NLRB was not "just and proper." In reaching this conclusion, the district court reasoned that a backpay award by the NLRB could fully remedy any discriminatory refusals to hire and that the ATU was a "small and intimate" union that could reconstitute itself upon favorable action by the NLRB.
 
 III. Reasonable Cause
 
 22
 To have prevailed in the district court, the Regional Director needed to show that the evidence described above gave reasonable cause to believe that an unfair labor practice had occurred. We turn to an exploration of the meaning of this phrase.
 
 
 23
 A. The Meaning of "Reasonable Cause"
 
 
 24
 It is settled that the "reasonable cause" standard under section 10(j) bars the district court from behaving as if it had general jurisdiction over the nation's labor laws. The district court may not decide whether or not to issue relief based on its own belief as to whether an unfair labor practice has been committed. See, e.g., Boire v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers, 479 F.2d 778, 792 (5th Cir.1973); Schauffler v. Local 1291, 292 F.2d 182 (3d Cir.1961) (10(l ) case). The amount of evidence required by the "reasonable cause" determination is less than that required to prove a violation. Yet, except to note that it is a "low threshold of proof," see Eisenberg v. Wellington Hall Nursing Home, Inc., 651 F.2d 902, 905-06 (3d Cir.1981), this circuit has not yet resolved the precise meaning of "reasonable cause" in section 10(j) cases. We believe, however, that doctrine developed in cases brought under section 10(l ) of the NLRA, 29 U.S.C. Sec. 160(l ), a companion provision directing the NLRB to seek interim injunctive relief when certain specified unfair labor practices are reasonably believed to have occurred, is helpful in ascertaining that meaning.[13]
 
 
 25
 We see no reason why courts should accord "reasonable cause" a different meaning in 10(j) cases than they do in 10(l ) cases. In Wellington Hall, 651 F.2d at 905, this court noted that in an earlier case, Eisenberg v. Hartz Mountain Corp., 519 F.2d 138, 143 (3d Cir.1975), "we held that reasonable cause to believe a violation of the act has occurred, a standard for injunctive relief originally developed in cases arising under section 10(l ) of the Act, is also applicable to section 10(j) proceedings." While this equation of the standard in section 10(j) cases with the standard in 10(l ) cases does not, of course, mandate that all features of the "reasonable cause" standard must be the same, it is worth observing that there is nothing in those cases that suggests the appropriateness of any distinction. In a leading section 10(l ) case, Hirsch v. Building & Construction Trades Council, 530 F.2d 298, 302 (3d Cir.1976), the court held that the burden of proof faced by a regional director is "relatively insubstantial." Moreover, the court held that the district court need not be satisfied with the "validity of the legal theory upon which [the Regional Director] predicates his charges." So long as the legal theory presented by a regional director is "substantial and not frivolous," the district court may grant appropriate relief in a section 10(l ) case.
 
 
 26
 Because of what we regard as the coincidence of the reasonable cause standard under section 10(l ) of the NLRA and under section 10(j) of the Act, we believe that a district court need make one of two findings before denying relief. It must find there to be no legal theory implicit or explicit in the regional director's argument that is substantial and not frivolous. Alternatively, the district court must find insufficient evidence--at least taking the facts favorably to the Labor Board--to support any non-frivolous theory appropriate to the case at bar.
 
 B. The Standard of Appellate Review
 
 27
 While the federal courts do not differ greatly on the precise meaning of "reasonable cause" in section 10(j) or section 10(l ) cases, they are split on the standard of review that the courts of appeals are supposed to apply when examining the refusal of a district court to find reasonable cause. The Eighth and Ninth Circuits have held appellate review over the reasonable cause determination, at least in section 10(l ) cases, to be plenary. See Wilson v. Milk Drivers & Dairy Employees Union, 491 F.2d 200, 203-04 (8th Cir.1974); Local No. 83, Construction Building Materials & Miscellaneous Drivers Union v. Jenkins, 308 F.2d 516, 517 n. 1 (9th Cir.1962) (dictum). These courts have reasoned that, because there is a "congressional policy favoring the grant of such injunctions in appropriate circumstances," review ought not be limited to the clearly erroneous standard as it is in cases granting relief. The NLRB urges us to adopt their view.[14]
 
 
 28
 On the other hand, the Second Circuit, in a recent opinion by Judge Friendly, and the Fifth Circuit, in an opinion by Judge Goldberg, have recognized that the district court's finding of "reasonable cause" has both a factual and legal component. See Kaynard v. Mego Corp., 633 F.2d 1026 (2d Cir.1980) (Friendly, J.) (10(j) case); Boire v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers, 479 F.2d 778, 788 (5th Cir.1973) (10(j) case). Accordingly, they have applied a bifurcated standard of review under which the factual findings of the district court about what happened and what is likely to happen are reviewable under the "clearly erroneous standard" as are all factual questions, whereas the substantiality of a regional director's legal theory tying the facts to a violation of the labor laws is deemed a legal issue, subject to plenary review. For the reasons outlined below, we reject the view of the Eighth and Ninth Circuits and adopt that of the Second and Fifth.
 
 
 29
 To begin with, the conclusion drawn by the Eighth and Ninth Circuits that appellate courts have plenary review over district court determinations that no reasonable cause exists does not necessarily follow from their assumption--which we do not, in any event, accept as necessarily true--that Congress favored injunctions in section 10(j) cases. Whatever Congressional policy exists in favor of injunctions would appear to be satisfied by the district court's application of a low "reasonable cause" standard to Labor Board requests for section 10(j) relief. To leap from a general policy to a particular doctrine requires a mediating theory not yet presented by the Board. Moreover, we note our discomfiture at establishing an asymmetric standard of review--one which allows the district court great discretion in granting injunctive relief, but almost no discretion in denying it.[15] We will want a very good reason to introduce such an abnormality into the law of appellate review.
 
 
 30
 Instead, we believe that in 10(j) cases, as elsewhere, the scope of appellate review should be determined by the degree of trust we possess as a general matter in the district court's ability to make varying types of decisions correctly and the nature of the decisions made by the district court in the particular case. As we have suggested above, the district court's reasonable cause determination really involves two separate determinations: is there a substantial legal theory explicit or implicit in the case that would support a finding that an unfair labor practice had occurred? If a substantial legal theory exists, do the facts satisfy the theory? The first of these questions, which requires characterization of the legal theory, is itself a "legal" issue; discerning the plausible penumbras of Labor Act provisions is a task that a three-judge appellate tribunal with responsibility to secure uniformity in the law is better equipped to perform than a trial court. The second of these questions, whether the facts as found satisfy the theory, is largely a factual one; a determination of the sufficiency and credibility of the evidence is a task that a trial court is better equipped to perform than an appellate court.
 
 
 31
 In sum, because of the dual nature of the "reasonable cause" standard, an appellate court's review must also be dichotomous. If it believes the district court erred in determining whether the legal theory implicit or explicit in the Labor Board's case was substantial or not, it must--absent other special factors--reverse the district court. But only if it believes the district court clearly erred in finding the facts and whether the facts satisfied the theory may the appellate court reverse.[16]
 
 C. Applying the Scope of Review
 
 32
 Having set forth the appropriate standard of review, we now apply it to the case at bar. The district court's bench opinion can be fairly read as resting its finding of no reasonable cause on three underlying conclusions. First, it noted that, because no Suburban employee had actually applied for a job with Shortway during the relevant time period, there had been no "refusal to hire by the new employer [Shortway]." Second, it found that any anti-union animus that did exist on the part of the bus lines was not the sole reason for their failure to hire, a requirement the court grounded on footnote 8 of the Supreme Court's opinion in Howard Johnson Co. v. Detroit Joint Executive Board, Hotel & Restaurant Employees & Bartenders International Union, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). Third, it apparently concluded that, because of what it regarded as the Suburban employees' steadfast refusal to accept employment at the Shortway wage rates, any improper behavior by Shortway was not a but-for cause of the harm alleged. We consider these predicate conclusions in turn.
 
 1. No Actual Refusal to Hire
 
 33
 Implicit in the first reason set forth above as justifying a no-reasonable-cause finding is a legal theory: absent an application by a potential employee and rejection of that application by the employer, there can be no discrimination in regard to hire constituting an unfair labor practice. We believe the district court erred in adopting this legal theory and in rejecting the opposing legal theory of appellant as insubstantial. It seems clear that there can be "discrimination in regard to hire" constituting at least a violation of section 8(a)(3) of the NLRA even when the employer never formally rejects an individual application. See Piasecki Aircraft Corp. v. NLRB, 280 F.2d 575, 583, 585, 590 (3d Cir.1960) (lack of response by unionized employees of predecessor employer to offer by successor employer to accept applications held not to cure successor's previous discriminatory refusal to hire, at least where previous unfair labor practice created perception of futility among union employees). Posting a sign, for example, that reads "No Blacks Need Apply" or that reads "No Union Members Need Apply" and that succeeds in its objectives is just as effective (and just as offending) a method of discrimination as a point-blank refusal to hire an individual black or union-affiliated applicant.[17]
 
 
 34
 It is equally non-frivolous, we think, to argue that, as a matter of law, an employer violates section 8(a)(3) if, by intentionally or recklessly misstating the times that applications are due or by intentionally or recklessly misrepresenting that all the jobs previously offered have been filled, the employer effectively prevents members of a certain union from applying for jobs. Finally, though perhaps not as conventional as the above-mentioned legal theories, it is also non-frivolous to argue that, by discriminating in regard to its methods of notifying potential employees of job openings--notifying potential employees in Detroit, for example, of job openings in Pennsylvania, but not even making a phone call to the head of a union representing soon-to-be unemployed, admittedly competent Suburban drivers--an employer discriminates "in regard to hire ... to discourage membership in any labor organization."[18] Cf. Kallmann v. N.L.R.B., 640 F.2d 1094 (9th Cir.1981) (fact that only nine of forty former employees applied for job with successor employer does not preclude bargaining order against successor employer where absent discriminatory practices--including unusually placed and misleading job advertisements--majority of old workforce would have been hired); Packing House & Industrial Services v. NLRB, 590 F.2d 688, 695 (8th Cir.1978) (effort spent in obtaining less experienced workers from distant city without corresponding attempts to contact predecessor's employees held to be relevant evidence of discriminatory refusal to hire).[19]
 
 
 35
 Accordingly, since the NLRB's legal theory was substantial and not frivolous, we believe the district court erred in denying section 10(j) relief to the NLRB on the basis that no Suburban employee had applied for employment with Shortway. Unless some other basis can be found for sustaining the judgment of the district court, the case must be remanded for decision under the legal theories we deem substantial.
 
 
 36
 2. The Sole Motive Theory and the Howard Johnson Case
 
 
 37
 The district court also erred in implicitly treating as frivolous the NLRB's claim that anti-union animus did not have to be the sole motive for discriminatory behavior in order for an unfair labor practice to be found. To begin with, the authority cited against the NLRB's proposition, footnote 8 in the Howard Johnson opinion, does not cover the ground contended for. What the Supreme Court said in this footnote was that "a new owner could not refuse to hire the employees of his predecessor solely because they were union members or to avoid having to recognize the union." But a statement does not necessarily imply its converse; that is, the Supreme Court's proclamation does not necessarily imply that a new owner could refuse to hire the employees of his predecessor if it did not do so solely because they were union members or to avoid having to recognize the union. Accordingly, the district court erred in holding Howard Johnson to be dispositive.
 
 
 38
 Moreover, there are significant indications that the converse of Howard Johnson is not a correct statement of the law. Supreme Court cases from Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945), to NLRB v. Transportation Management Corp., --- U.S. ----, 103 S.Ct. 2469, 2471, 76 L.Ed.2d 667 (1983), establish that anti-union animus need not be the sole motivation behind a discriminatory practice--or at least a discriminatory discharge--in order to find a violation of section 8(a)(3). Thus, without deciding on the precise standard to be applied in mixed motive cases, it is clearly non-frivolous to maintain that anti-union animus need not be the sole motive for an employment decision in order for that decision to constitute an unfair labor practice.
 
 3. No But-for Causation
 
 39
 As noted above, the district court also rested its finding of no reasonable cause on the conclusion that, because of what it regarded as the Suburban employees' steadfast refusal to accept employment at the Shortway wage rates, any improper behavior by Shortway was not a but-for cause of the alleged harm. While we acknowledge that a finding of no but-for causation might render insubstantial any legal theory advanced by a regional director, the evidence needed to support such a finding was absent here. In support of its finding, the district court cited "particularly revealing" testimony of Mr. Keplar, president of the ATU, that he would not work at the "Shortway rate."[20]
 
 
 40
 The testimony relied upon by the district court is an insufficient grounding for its decision. To begin with, Mr. Keplar's individual antipathy toward working at what turned out to be the Shortway wage should not be taken as disposing of the issue of whether other ATU employees would be willing to work at the reduced wage rate offered by Shortway. More importantly, the district court's analysis constitutes legal error, because it does not account for the effect of the alleged unfair labor practice in setting the wage rate that the Suburban drivers found unacceptable. If Shortway had not refused to hire the Suburban drivers, under the Burns doctrine the ATU might have been installed as the bargaining representative of the Shortway employees. The ATU might well have been able to extract a higher wage rate from Shortway than was pressed for by the Teamsters. Accordingly, it constituted legal error to rely on the fact that the Suburban drivers refused to accept the wage rate imposed after Shortway initially refused to hire them as proof that there was no but-for causation between the allegedly discriminatory initial refusal to hire and the ultimate inability of the Suburban drivers to regain their old positions.
 
 
 41
 To summarize our disposition of the appeal at this point, we have found that the reasons offered by the district court for not finding reasonable cause to believe an unfair labor practice had occurred were legally insufficient. However, several factors prevent this determination from resulting in our vacatur of the district court judgment. First, even under the legal theories we deem substantial here, the district court might find the evidence before it insufficient to demonstrate the applicability of those theories. Second, and very importantly, because the district court dismissed the case at the close of the Regional Director's evidence, the defendants have not had the opportunity to present evidence related to several affirmative defenses they intended to offer.[21] Third, and also importantly, even if the district court erred in finding no reasonable cause to believe an unfair labor practice had occurred, its judgment could be sustained if it correctly found that no injunctive relief was just or proper.
 
 IV. Just and Proper
 A. The Scope of Appellate Review
 
 42
 The parties stake out the following positions concerning the standard of appellate review over the district court's determination that the injunctive relief sought by the Regional Director was not "just and proper." The NLRB, which lost below, argues that our review should be plenary: we should reverse if we think the relief it requested was "just and proper." By contrast, the bus lines argue for a very narrow scope of review: we should reverse only if we determine that the district court abused its discretion.
 
 
 43
 The positions of both the NLRB and of the bus lines have as an unstated premise the notion that the amorphous phrase "just and proper relief" is one susceptible to definition. The Board's call for "plenary review" is, of course, a demand that we determine ourselves what relief is just and proper; the bus line's call for an abuse-of-discretion standard requires us to find some base point of justice and propriety from which to measure the district court's departure. Despite this implicit reliance, however, neither side has made much of an effort at attempting to define "just and proper" relief, either by reference to substantive criteria or by suggesting processes the district court might undertake in its effort to achieve such relief.
 
 
 44
 The parties are not to be faulted, however, for this logical lacuna. As we shall now show, the circuit court jurisprudence has not been terribly helpful in giving content to the phrase "just and proper" as a method of cabining the otherwise unfettered discretion of the district court to fashion labor law under section 10(j) wholly according to its own notions of fairness and efficiency.
 
 
 45
 The cases cited by the Regional Director as supporting plenary review over the just and proper determination by the district court, Brown v. Pacific Telephone & Telegraph Co., 218 F.2d 542 (9th Cir.1954) and Local 83, Construction Drivers Union v. Jenkins, 308 F.2d 516, 517 n. 1 (9th Cir.1962) are neither controlling in this circuit nor unambiguous in their holdings. It is hardly clear whether the Brown court, in reversing the district court's determination to deny 10(j) relief, held that an appellate court had plenary review over the district court's just and proper determination and found the district court to be in error, or whether the Ninth Circuit applied the abuse of discretion standard contended for by the employers in that case and found the denial of section 10(j) relief by the district court to be an abuse of that discretion.[22] It is also possible that, in the early days of section 10(j) law, the courts simply did not focus on whether a separate standard of appellate review should exist over the just and proper determination. Local 83 is, if anything, less helpful to the NLRB.[23] While it is true that in dictum and in a footnote the Ninth Circuit said that it would not apply the "clearly erroneous" standard when reviewing denials of section 10(l ) relief, it appears that the Ninth Circuit was explicitly referring to the reasonable cause determination and not to the just and proper determination. See supra note 23.
 
 
 46
 On the other hand, there are appellate cases that might be construed as creating an "abuse of discretion" standard over the just and proper determination, and yet these cases are careful not to equate the range of permissible discretion in section 10(j) cases, in which the district court is acting in some sense as a reviewing court, with that normally available to the district court.[24] See, e.g., Eisenberg v. Wellington Nursing Home, 651 F.2d 902 (3d Cir.1981). As one member of this panel has sagely recognized, "[k]nowing simply that one is invested with discretion does not tell much. The crucial inquiry, necessarily, is the extent of the discretionary power conferred." R. Aldisert, The Judicial Process 742 (1976). In Wellington Hall Nursing Home, Judge Gibbons, writing for this Court stated that it was "an abuse of the discretion that section 10(j) affords" for the district court to deny a reinstatement remedy. 651 F.2d at 907. Presumably because the district court's error was sufficiently egregious to make resolution of the issue unnecessary, that panel did not decide just how much discretion section 10(j) afforded the district court.
 
 
 47
 We do not believe we could pretend to legitimacy, or, concomitantly, that there would be much to be gained were we to attempt to give concrete character to the phrase "just and proper" by a process of reasoned elaboration relying on dictionary definition or other tools of literalism. Rather, as in Hecht v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944), this is an instance where courts do better not so much to focus upon the particular words of the governing statute, but upon the general communication the law-making bodies were attempting to send to the courts and the public in passing the relevant act. The process to be undertaken, be it on the district or appellate levels, is much like determining the meaning of an unknown (and even unknowable) phrase from context and on the basis of shared understandings. See generally R. Dickerson, The Interpretation and Application of Statutes 103-36 (1975). This process is not determinate enough to allow an appellate tribunal to reverse a district court merely because, as a matter of first impression, it would have found differently. It does allow the appellate court, however, at least to ensure that the district court is speaking the same language as those passing the statute. The appellate court can and should ensure that, in the words of Hecht v. Bowles, the district court has focused upon "the large objectives of the Act."
 
 
 48
 We now sketch out the primary understanding that should animate the district court in the exercise of its discretion over just and proper relief in section 10(j) cases. The district court should cognize that section 10(j) was designed to enable the Labor Board to vindicate its ultimate remedial power by affording limited interim relief in instances where the passage of time reasonably necessary to adjudicate the case on its merits convinced both the Board and the federal courts that the failure to grant such relief might dissipate the effective exercise of such power.[25] By the same token, the relief to be granted is only that reasonably necessary to preserve the ultimate remedial power of the Board and is not to be a substitute for the exercise of that power.[26]
 
 
 49
 In order to ensure meaningful appellate review over exercises of discretion guided by the above principles, the district court in making its judgment regarding the justice and propriety of 10(j) interim relief should substantially relate its understanding of this broad principle of section 10(j) law to the result it reaches in the particular case. The discussion need not be elaborate nor should appellate tribunals insist on formalistic incantation of the principles we sketch out today. Rather, in reaching its conclusion, the district court should discuss and determine whether the failure to grant interim injunctive relief would be likely to prevent the Board, acting with reasonable expedition,[27] from effectively exercising its ultimate remedial powers. The reviewing court, in applying the "abuse of discretion" standard set out in Wellington Nursing Home, should not disturb factual findings made for this purpose unless clearly erroneous. And it should not reverse the decision of the district court reached thereby (i.e., whether interim injunctive relief appears warranted) unless the undisturbed factual findings do not substantially relate to the conclusion reached.
 
 B. Applying the Scope of Review
 
 50
 Although not as precise on the subject it would have been if it had had the benefit of our opinion, the district court in this case has essentially satisfied our concerns. It obviously understood the importance of preserving the ultimate remedial powers of the NLRB as well as the importance of not allowing section 10(j) to become the normal method for resolving labor disputes.[28] The only close question is whether there is a substantial relationship between the facts found and the conclusion reached. For the reasons that follow, we are satisfied on this point as well.
 
 1. Reinstatement
 
 51
 At two points in its bench opinion, the district court offered justifications for its decision not to compel respondents to make offers of reinstatement to the former Suburban employees. At one point, the district court found that, because a final NLRB adjudication (enforced by the court of appeals) would permit reinstatement and appropriate back pay awards to the injured Suburban employees, see Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), its own failure to grant interim reinstatement relief could not produce irreparable injury. The court further expressed worry that erroneously granted interim relief would irreparably injure those originally hired by Shortway, and Shortway itself.
 
 
 52
 If this first justification offered by the district court for its refusal to grant interim reinstatement relief stood completely alone, we would be obliged to reverse under any standard of review. However compelling may be the arguments of the district court for denying reinstatement relief, and however often courts in other jurisdictions may have accepted them, see, e.g., Mack v. Air Express International, 471 F.Supp. 1119, 1125 (N.D.Ga.1979);[29] Crain v. Fabsteel Co., 427 F.Supp. 316, 318 (W.D.La.1977),[30] after the Wellington Nursing Home decision, they are contrary to the settled law of this circuit. As a panel of this Court explained in Wellington, an exclusive or even predominant focus on the relief to be granted to individual employees is incorrect because it ignores the harm to the bargaining process that may accompany delayed relief. 651 F.2d at 906-07. The basic theory is that denial of interim reinstatement effectively denies employees the fruits of the collective bargaining process that otherwise would have been available to them prior to ultimate reinstatement.
 
 
 53
 Later in its opinion, however, the district court offers a second justification for denying interim reinstatement. This justification appears to take account of the potential for harm to the collective bargaining process that might otherwise accompany delayed reinstatement of union-supporting employees. The district court wrote, "Given the size and intimacy of A.T.U. Local 1543, we have no reason to think that it could not swiftly and effectively reconstruct itself should the Board uphold its charge." In effect, the district court carved out a "small and intimate" exception to the Wellington Nursing Home doctrine. Since no one can seriously contend that the district court clearly erred in its finding that the union local was small and intimate, the only question left for us is whether it was within the permissible discretion of the district court to carve out such an exception from the Wellington Nursing Home rule, that is, whether this finding substantially related to the conclusion that interim relief was not needed in the case to vindicate the ultimate remedial power of the Board.
 
 
 54
 The Regional Director argues forcefully that we should not acquiesce in the district court's theory concerning interim reinstatement relief. It notes that given high unemployment, particularly in Western Pennsylvania, "many of the idled Suburban employees, faced with the need to secure employment, will decide to 'vote with their feet' and find jobs in other areas, which jobs they may be reluctant to given up in order to return to work for Suburban or Shortway." (Pet.Br. at 39-40). "As a result," the argument continues, "when the Board finally orders reinstatement and bargaining with the Union 'the base of Union support would be scattered to the four winds' and any bargaining would be on a radically different footing than that [which would be conducted were interim reinstatement ordered]." (Pet.Br. at 40, quoting Wilson v. Liberty Homes, Inc., 108 LRRM at 2708).[31]
 
 
 55
 The problem with the Regional Director's argument is that it lacks support in the record. There was no expert testimony or documentary evidence put forth--or at least none cited to us--showing the proclivity of employees to scatter to the four winds.[32]
 
 
 56
 While we would be more comfortable with the district court's conclusion if it had more empirical evidence to support its thesis that a small and intimate union would be better able than the average union to reform itself after the NLRB ultimately awarded reinstatement, in the absence of contrary evidence and given the seeming reasonableness of the conclusion and the district court's superior vantage point, we cannot say that the district court's predictive factual finding was clearly erroneous or that it was not a substantial basis for its conclusion. Nor can we say that the district court abused its discretion in finding these factors sufficient to rebut the presumption created by Wellington Nursing Home that ultimate reinstatement is unlikely adequately to vindicate the remedial powers of the Board. Accordingly, the district court did not abuse its discretion in denying section 10(j) relief.[33]
 
 2. Other Relief
 
 57
 Our holding that the district court was within its discretion in denying interim reinstatement to the employees of Suburban disposes of several other contentions raised by the Board. Where the district court legitimately refuses to order the successor company to hire the employees of its predecessor, it makes absolutely no sense to order the successor to bargain with the representative of the unhired employees of the predecessor.[34] It makes even less sense under such circumstances to impose the terms of the contract between Suburban and the ATU on the current employer (Shortway) and the bargaining representative of its employees, the Teamsters. Finally, given that the district court did not abuse its discretion in denying interim relief against the successor company, Shortway, we have no occasion here to decide whether, if Shortway was liable, Suburban would be liable on grounds that it engaged in a "joint venture" with Shortway. Cf. Alkire v. NLRB, 716 F.2d 1014 (4th Cir.1983) (analyzing similar issue on an alter ego theory).
 
 V. Conclusion
 
 58
 This case is a difficult and close one. Restricting our attention solely to the record before us and not supplementing our views with the record that has subsequently been developed in administrative proceedings, we believe the district court erred in failing to find reasonable cause to believe that an unfair labor practice had been committed. However, we cannot say the district court impermissibly erred, in the absence of any contrary factual showing, in holding that, because this small and intimate union could easily reconstitute itself upon a grant of relief by the NLRB, interim reinstatement relief under section 10(j) of the NLRA was not just and proper. Accordingly, the judgment of the district court will be affirmed.
 
 
 59
 ALDISERT, Circuit Judge, concurring.
 
 
 60
 Unlike the majority, I do not find this case to be "a difficult and close one." It can become such only if you attempt to engraft artificial fiber and sinew to the gossamer presentation made by the Regional Director before the district court.
 
 
 61
 Although I concur in the result reached by the majority, I join without reservation only Part III A and B of its opinion, wherein it defines the concept of reasonable cause under Sec. 10(j) and the standard of appellate review. I accept the majority's discussion in Part IV with the understanding that it does not advance any novel concepts of a preliminary injunction proceeding before district judges and that essentially what distinguishes a Sec. 10(j) hearing from a request for a mine-run preliminary injunction is that the Regional Director, as the plaintiff, has a rather low threshold to meet his or her burden of proof. I am unable to join in Part II of the majority's opinion, described as "Facts," because I believe that the account confuses facts as found by the district court, which are subject to the clearly erroneous rule on appeal, with stray bits of evidence presented at the hearing.[1]
 
 
 62
 In addressing the Regional Director's request for injunctive relief, the district court made several findings of fact that I deem critical to our consideration of the issues presented by this appeal. It found that Suburban was a relatively small operation with about thirty drivers and eight mechanics. Its president, Hilty, was a former bus driver who still drove on occasions and who was permitted by the union to retain his place on the seniority list in the event he lost his job as president.[2] It found:
 
 
 63
 The company had been losing money in recent years, and in August, 1982, it received an offer to sell its assets. This came about when Hilty, the president, submitted his resume to Holland Industries seeking employment. In ensuing conversations with personnel at Holland, which, through subsidiaries operated several different transit operations and was always looking for investment opportunities, an agreement was reached to sell Suburban's assets.
 
 
 64
 App. at 1298-99. The trial court had no doubt that the sale was "an arm's length transaction," id. at 1299, and it found "no credible evidence" that the sale "was a joint venture as charged by the Petitioner," id. at 1300. Holland utilized 10 of its existing employees for the Short Way operation and hired 20 employees from the Detroit area. In October, 1982, the hourly pay scale of the old Suburban employees was: drivers, $8.74; first-class mechanics, $9.11; regular mechanics, $8.90; fuelers and washers, $8.54; and an additional $.55 per hour was paid by the company into the pension fund. The wage scale of the drivers in the Teamsters local was about $4.80 per hour. Significantly, the court found that "[a]bout October 20, Warren George, international vice president of the Amalgamated Transit Union, received job applications for Local 1543 employees to apply to the new company. No Suburban employees applied prior to October 30, 1982 .... Since then several have applied for jobs and been hired." Id. at 1300-01. The president of the Transit union, the charging party, testified that he rejected the offer to go back to work "[b]ecause of the low wage," stating that "[he didn't] want the Teamsters but if it would have been a good enough paying job, [he] would [have lived] with them." Id. at 1302. I believe that these are extremely important findings to be measured against the appropriate standard of review--keeping in mind that it is the district court's findings that are subject to review, not isolated tidbits of testimony.
 
 I.
 
 65
 Unlike the majority, I conclude that the Regional Director failed to meet his admittedly low threshold of demonstrating "that he has reasonable cause to believe that the elements of an unfair labor practice are present and that the legal theory upon which he proceeds is 'substantial and not frivolous.' " Hirsch v. Building & Construction Trades Council, 530 F.2d 298, 302 (3d Cir.1976) (quoting Schauffler v. Local 1291, 292 F.2d 182, 187 (3d Cir.1961)). But I agree with the majority that the district court properly determined that "even were reasonable cause present in this case, the injunctive relief sought would not be just and proper in any respect." App. at 1309. I address first general Sec. 10(j) case law and the standard of review.
 
 A.
 
 66
 The seminal case of Eisenberg v. Hartz Mountain Corp., 519 F.2d 138 (3d Cir.1975), explains the distinction between federal court proceedings brought by the NLRB under Secs. 10(l )[3] and 10(j). Hartz Mountain emphasizes that "[i]llegal organizational or jurisdictional strikes, secondary boycotts and hot cargo contracts are the specified wrongs that are the subject matter of Section 10(l )," and "[i]n its nature any such conduct impinges directly upon the public interest in the free flow of commerce." Id. at 141. But there is a different emphasis in Sec. 10(j) cases:
 
 
 67
 Section 10(j), different from Section 10(l ), creates jurisdiction to grant "just and proper" temporary relief pending Board decision upon any unfair labor practice charge, even though no disruption of commerce is charged. Thus, the exigencies of determining what relief, beyond enjoining disruption of commerce, is "just and proper" are likely to be of critical importance when relief is sought under Section 10(j) ....
 
 
 68
 Id. In considering a Sec. 10(j) injunction petition, therefore, this court teaches that the district courts must determine, case-by-case, what judicial action will be "in the public interest." Id. at 142. Accordingly, we must ask whether it is "just and proper" in the sense of being in "the public interest" that an injunction issue here pending the NLRB's resolution of the underlying unfair labor practice controversy.
 
 
 69
 Our inquiry is especially critical because in making its request for injunctive relief in March 1983, the Regional Director did not seek to preserve the status quo--the usual relief sought in preliminary injunctions--but instead sought to jettison extensive changes that had been made five months prior thereto by the bus line's new owner. He requested a successor company to discharge its present employees and rehire former employees of the predecessor company who had not applied for employment with the successor. And he requested the district court to do all this far in advance of any finding of an unfair labor practice. Granting injunctive relief prior to the Board's resolution of the underlying unfair labor practice charges is very drastic under ordinary circumstances, but nevertheless authorized by Congress; yet under the unusual circumstances here, it indeed would be very strong medicine.
 
 
 70
 The role of the appellate court in Sec. 10(j) cases has been delineated by this court:
 
 
 71
 In Eisenberg v. Hartz Mountain Corp., 519 F.2d 138, 143 (3d Cir.1975), we held that reasonable cause to believe a violation of the act has occurred, a standard for injunctive relief originally developed in cases arising under section 10(l ) of the Act, is also applicable to section 10(j) proceedings.
 
 
 72
 Eisenberg v. Wellington Hall Nursing Home, Inc., 651 F.2d 902, 905 (3d Cir.1981). We have said the scope of review in Sec. 10(l ) cases is the familiar clearly erroneous standard. Hirsch, 530 F.2d at 303; Schauffler, 292 F.2d at 187. As guidance to district courts, we have stated:
 
 
 73
 Since the Sec. 10(l ) proceeding is thus ancillary to the main unfair labor practice action committed to the Board's exclusive jurisdiction, the Regional Director faces a relatively insubstantial burden of proof when he petitions a district court for temporary injunctive relief pursuant to Sec. 10(l ). He need not prove that a violation of the NLRA has in fact occurred. Nor must he convince the district court of the validity of the legal theory upon which he predicates his charges. Both questions are for the Board's determination in the first instance, subject to the right of appellate review. Rather, he need only demonstrate that he has reasonable cause to believe that the elements of an unfair labor practice are present and that the legal theory upon which he proceeds is "substantial and not frivolous". Samoff v. Building & Construction Trades Council of Phila. & Vicinity, 475 F.2d 203 (3d Cir.1973), vacated for mootness, 414 U.S. 808, 94 S.Ct. 151, 38 L.Ed.2d 44 (1973); Schauffler v. Local 1291, International Longshoremen's Ass'n, 292 F.2d 182 (3d Cir.1961).
 
 
 74
 Hirsch, 530 F.2d at 302-03. Finally, this court, speaking through Judge Gibbons, has held that in a Sec. 10(j) case "[t]he trial court's determination that this low threshold of proof was met is reviewed by a clearly erroneous standard." Wellington Hall, 651 F.2d at 905.
 
 B.
 
 75
 With respect to the standard of review, the Regional Director wants the best of both worlds. He asks us to preserve his low threshold burden of proof at trial but to reject the "clearly erroneous" review standard when he loses there. He advocates a "heads I win, tails you lose" standard of review, requesting this court to apply the "clearly erroneous" review standard only when he wins in the court below, and a much broader scope of review when he loses. He seeks to extend the approach of two sister circuits, which distinguish between granting and denying relief in Sec. 10(l ) cases, to the Sec. 10(j) context. See, e.g., Wilson v. Milk Drivers & Dairy Employees Union, 491 F.2d 200 (8th Cir.1974); National Maritime Union of America v. Commerce Tankers Corp., 457 F.2d 1127 (2d Cir.1972). But I refuse to endorse an "unchanneled, undirected, and unchartered" concept that is both "inarticulable and unreasoned."[4] Even-handed justice is still the polestar in this court. I adhere to Judge Gibbons' forthright statement in Wellington Hall and join in the majority's analysis.
 
 II.
 
 76
 The Regional Director based his petition for temporary injunctive relief on the theory that the companies had committed unfair labor practices by: (1) transferring assets in a manner designed to thwart the Transit union; and (2) refusing to hire Suburban employees. The district court found that the Regional Director failed to demonstrate that he had reasonable cause to believe that those unfair labor practices had been committed. It found no evidence of a "joint venture" between the selling and buying companies designed to thwart the Transit union that would support the first alleged unfair labor practice charge; it also found no evidence of a discriminatory refusal to hire. In sum, the trial court found the Regional Director's case to be insubstantial.
 
 
 77
 Subjecting the district court's findings of fact to the appropriate standard of review, I cannot conclude that those findings are clearly erroneous. Because the sale of Suburban to Holland was a bona fide arm's length transaction, the trial court's finding that no "joint venture" was created to thwart the union must be sustained. In addition, because no employees filed employment applications with Short Way until the changeover in October, 1982, and the court finding no other facts to support the plaintiff's theory, there could be no discriminatory refusal to hire. As the district court noted:
 
 
 78
 We do not, however, read this low standard of proof as mandating the regional director to pursue flights of fancy or to simply ignore all the evidence suggesting a conclusion contrary to the one he has chosen to draw.
 
 
 79
 Even were we to find in the record sufficient evidence to support a reasonable cause finding by the regional director, Section 160(j) gives us only the power to grant such injunctive relief as we deem just and proper. In our view, the only factual finding in this case which could have rendered substantial equitable relief just and proper would have been a finding that Shortway Suburban/Shortway Airport Limousine systematically discriminated against all the old Suburban A.T.U. Local 1543 employees and absent such discrimination all of the old workers would have been hired. Such a finding was the core premise of the petitioner's argument for injunctive relief.... [In its trial memorandum] the petitioner argued "that it is reasonable to believe that but for Respondent Single Employer's discrimination refusal to hire the Respondent Suburban employees, the charging party would have continued to enjoy majority representative status."
 
 
 80
 The problem with petitioner's analysis is that while the evidence of discriminatory hiring was inadequate to support reasonable cause, the evidence that the alleged discrimination prevented the hiring of all of the old Suburban employees was simply nonexistent.
 
 
 81
 App. at 1306-07. To me, Judge Cohill's statement is unassailable. And this, of course, brings me into sharp conflict with the majority's analysis in Part III C of its opinion.
 
 
 82
 My primary difficulty is with what the majority calls the "three underlying conclusions" of the district court's finding of no reasonable cause. The majority writes:
 
 
 83
 The district court's bench opinion can be fairly read as resting its finding of no reasonable cause on three underlying conclusions. First, it noted that, because no Suburban employee had actually applied for a job with Shortway during the relevant time period, there had been no "refusal to hire by the new employer [Shortway]." Second, it found that any anti-union animus that did exist on the part of the bus lines was not the sole reason for their failure to hire, a requirement the court grounded on footnote 8 of the Supreme Court's opinion in Howard Johnson Co. v. Detroit Joint Executive Board, Hotel & Restaurant Employees & Bartenders International Union, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). Third, it apparently concluded that, because of what it regarded as the Suburban employees' steadfast refusal to accept employment at the Shortway wage rates, any improper behavior by Shortway was not a but-for cause of the harm alleged. We consider these predicate conclusions in turn.
 
 
 84
 Maj. op. at 1086 - 1087. I am not satisfied that the majority's paraphrase of the district court's analysis candidly reflects the reasoning or the determination of the trial court. Dictates of dispassionate appellate review compel a reference to the exact language of the district court.
 
 Judge Cohill writes:
 
 85
 The charging party through the government asserts that the new company refused to hire former employees of Suburban because of its animus against the Local 1543. There is not one scintilla of evidence that a single Suburban employee sought employment from the new company prior to October 30. Since then several have applied for jobs and been hired.
 
 
 86
 * * *
 
 
 87
 The government also sought to prove that the employees of the new company were less competent than the old Suburban employees. We are willing to accept that as a fact for purposes of this discussion. We are also willing to assume that the new owners of the bus line did not encourage the former employees to seek employment, and that the former employees may have been confused as to how to go about applying.
 
 
 88
 * * *
 
 
 89
 What we don't have is a refusal to hire by the new employer. Indeed several former employees of Suburban have been hired, and, as noted, the president of the charging party refused a job that was offered to him because the pay was not high enough to suit him, and he remains unemployed to this day through his own choice.
 
 
 90
 * * *
 
 
 91
 It is well established that a business entity taking over the assets or operations of a preexisting company has the right not to hire any of the old employees, if it so desires. See Howard Johnson Company v. Detroit Joint Board, 417 U.S. 249 at page 262 [94 S.Ct. 2236 at page 2243, 41 L.Ed.2d 46] (1974); NLRB against Burns International Security Services, 406 U.S. 272, at pages 280-281, n. 5 [92 S.Ct. 1571, at pages 1578-1579, n. 5, 32 L.Ed.2d 61] (1972). While the Supreme Court has recognized that an anti-union, discriminatory refusal to hire is an unfair labor practice, it is important to note that under Howard Johnson the discrimination must be the sole reason for the failure to hire. See 417 U.S. at 262, n. 8 [94 S.Ct. at 2243, n. 8].
 
 
 92
 In the case before us, there is simply no evidence from which a reasonable fact finder could conclude that Shortway Suburban/Shortway Airport Limousines decision to employ the workers it selected for its Western Pennsylvania operations was dictated solely by a desire to thwart the A.T.U., Local 1543.
 
 
 93
 Absent adequate evidence showing discriminatory hiring by Shortway Suburban/Shortway Airport Limousines and further evidence establishing a causal link between such discrimination and the failure of the A.T.U., Local 1543, to represent a majority of the new employees, most of the injunctive relief sought by the petitioner would represent a wholly speculative exercise of our equity powers.
 
 
 94
 App. at 1301-08.
 
 
 95
 This language discloses that only the first of the majority's three characterizations of the district court's "underlying conclusions" was accurately or properly paraphrased. An examination of the district court's opinion reveals that the court did not find "anti-union animus that did exist on the part of the bus lines." And it is improper to suggest that it did. Moreover, the court made no conclusion that there was "any improper behavior by Shortway" or that such behavior "was not a but-for cause of the harm alleged." Thus, I cannot agree with the majority that these were "predicate conclusions" of the district court.
 
 
 96
 To suggest that the district court found "anti-union animus" or "improper behavior" are conclusions artificially and self-constructed by the majority. At the very best, the technique is known as the fallacy of irrelevance, often referred to as irrelevant conclusion or ignoratio elenchi: the material fallacy of attacking something that has not been asserted.[5] In the vernacular, this is known as erecting a strawman and then striking it down.
 
 
 97
 At bottom, what distinguishes the majority's discussion from the district court's is the difference between an expression of conjecture[6] and the application of theory applied to the facts found in this case. Struggle though it does through its labyrinthine argument, the majority never comes to grips with the facts found by the district court in this case:
 
 
 98
 There is not one scintilla of evidence that a single Suburban employee sought employment from the new company prior to [the consummation of the sale] on October 30. Since then several have applied for jobs and been hired.
 
 
 99
 App. at 1301 (emphasis added). This critical finding can be ignored only if you accept the Regional Director's underlying major premise, apparently accepted by the majority, that there is some duty for a successor company to hire employees of its predecessor. Such a notion runs completely counter to Howard Johnson Co. v. Detroit Joint Executive Board, Hotel & Restaurant Employees & Bartenders International Union, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974) and N.L.R.B. v. Burns International Security Services, Inc., 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). These cases teach that there is nothing in the federal labor laws that requires that an employer who has purchased the assets of a business "be obligated to hire all the employees of the predecessor though it is possible that such an obligation might be assumed by the employer."[7] Distilled to its essence, the majority argument contends that the district court rejected the theory of the Regional Director, see majority op. typescript at 1087 - 1089; in my view, the court did not reject the plaintiff's theory but instead determined that no evidence supported the theory. And the majority has made no determination that any narrative or historical facts found by the court were clearly erroneous.
 
 III.
 
 100
 The district court held that even if there were evidence to support a finding of reasonable cause, the injunctive relief sought would not be just and proper in any respect. Here I join the majority's discussion and offer only additional observations. A permissible reading of the district court's opinion suggests that, in reaching this conclusion, it considered basic principles of equity and concluded, without stating in ipsis verbis, that the doctrine of laches precluded relief.[8]
 
 
 101
 The equitable doctrine of laches involves three elements: (1) delay in asserting a right or claim, (2) that was inexcusable, and (3) that prejudiced the defendant. University of Pittsburgh v. Champion Products Inc., 686 F.2d 1040 (3d Cir.), cert. denied, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982); Gruca v. United States Steel Corp., 495 F.2d 1252, 1258 (3d Cir.1974); Sobosle v. United States Steel Corp., 359 F.2d 7, 12-13 (3d Cir.1966); Kane v. Union of Soviet Socialist Republics, 189 F.2d 303, 305 (3d Cir.1951) (in banc). See also E. RE, REMEDIES 535-39 (1981). By its very nature, the doctrine addresses itself to the sound discretion of the trial judge. Absent an abuse of discretion, therefore, we should not disturb the district court's determination. Gardner v. Panama R.R., 342 U.S. 29, 30, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951) (per curiam); Gruca, 495 F.2d at 1258.
 
 
 102
 Measuring the district court's opinion against these precepts, I am impressed that the court noted that "Today, April 20, 1982, we are nearly six months beyond the status quo the petitioner wishes us to 'maintain' by affirmative injunction." App. at 1309. As noted by the majority in Part II of its opinion, the Transit union first filed its charge with the NLRB on November 9, 1982; the Regional Director filed an unfair labor complaint before the Board on December 30, 1982, but did not seek the mandatory federal court relief until almost three months later, on March 4, 1983. The district court handed down its decision on April 20, 1983. The Regional Director did not immediately appeal to this court. He waited until a month later, May 19, 1983. On June 3, 1983, he moved to expedite the appeal, and the motion was granted by a panel of this court on June 29, 1983. The Regional Director's sense of urgency then apparently having dissipated, he successfully moved to file his brief and appendix out of time. This appeal was argued on an expedited basis on September 27, 1983. Meanwhile, in the administrative proceedings, the General Counsel did not schedule the initial day of hearing until May 4, 1983, a hearing date more than four months after the issuance of the complaint. After the ALJ rendered his decision on December 27, 1983, the Regional Director requested an extension of over one month to file exceptions to the decision. Thus, while the district court was asked by the NLRB to furnish relief pending the administrative hearing, and while this court was asked to expedite the appeal, the NLRB had decelerated from its usual snail's pace.
 
 
 103
 Evaluating the NLRB's action only from the time the charge was filed with the Board to the date the complaint was filed in federal court--and disregarding the stalling that has occurred since--this case unquestionably reeks of delay. Thus, the first criterion of the laches doctrine is satisfied. As the Board offered no reasons to justify its tardiness, I find the delay also to be inexcusable, thus satisfying the second criterion.
 
 
 104
 I do not believe that this is the type of delay envisioned by Congress in enacting Sec. 10(j). The Senate Report stated:
 
 
 105
 Experience under the National Labor Relations Act has demonstrated that by reason of lengthy hearings and litigation enforcing its orders, the Board has not been able in some instances to correct unfair labor practices until after substantial injury has been done. Under the present act the Board is empowered to seek interim relief only after it has filed in the appropriate circuit court of appeals its order and the record on which it is based. Since the Board's orders are not self-enforcing, it has sometimes been possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible to restore or preserve the status quo pending litigation.
 
 
 106
 S.Rep. No. 105, 80th Cong., 1st Sess. 27 (1947). The right to injunctive relief presumes timely NLRB administrative processes. Congress apparently was not concerned primarily about the footdragging of the NLRB in filing a complaint in federal court and its inexcusable failure to schedule a timely administrative hearing--as evidenced here--but about the delay between the Board's decision and its later enforcement by the United States Court of Appeals. In any event, I associate myself completely with what District Judge Duffy said in Seeler v. H.G. Page & Sons, Inc., 540 F.Supp. 77 (S.D.N.Y.1982):
 
 
 107
 Although Congress specifically noted that some interim relief may be necessary because of "the relatively slow procedure of the Board hearing," this remedy does not apply where the Board itself does not treat the ongoing violations with urgency. It took nearly four months for the Board to request injunctive relief. The hearing before the administrative law judge is tentatively scheduled for June 15, 1982. I do not believe any additional "union erosion" will occur in the next month that the Board has not already deemed permissible by waiting four months to come into federal court. Congress may have enacted 10(j) to compensate for an admittedly slow administrative adjudication process, but it did not intend to countenance undue delay in requesting interim injunctive relief. The Board's inaction in this case is the most compelling evidence against the need for intervention by this court. Thus, pending the administrative hearing and decision, it does not appear that the union will require or deserves injunctive relief.
 
 
 108
 Id. at 79 (citation omitted). These sentiments have been endorsed by this court in Wellington Hall, 651 F.2d at 907, and Hartz Mountain, 519 F.2d at 144. In the latter case, we stated:
 
 
 109
 we think a pledge of expeditious administrative action is necessarily implicit in a petition for a Section 10(j) injunction.
 
 
 110
 519 F.2d at 144. See also Siegel v. Marina City Co., 428 F.Supp. 1090 (C.D.Cal.1977) (three-month delay).
 
 
 111
 This brings me to the final criterion of the laches doctrine--prejudice to the defendant caused by plaintiff's inexcusable delay. The district court found as a fact that the former owner no longer has anything to do with the operation and that at the time of the hearing, the new owner had been operating the bus line for almost six months. The prejudice to the defendants from this delay is obvious. If injunctive relief were now granted, Short Way would be required to make massive changes in its work force and in the operation of its business. It would have to change, without an election, its bargaining representative and, without collective bargaining, its wage rates. It would have to fire its present experienced employees and hire others. It would have to do all this in advance of a final administrative adjudication of the underlying unfair labor practice charges. Thus, even presuming the Regional Director met his threshold burden of proving reasonable cause, I have no difficulty in determining that the district court did not abuse its discretion in denying injunctive relief on the basis that laches rendered such relief unjust and improper.
 
 
 112
 Under the circumstances presented here--laches in filing the complaint and the dreadful tardiness in processing the unfair labor practice charge before the Board--this court has been justified in delaying its decision until receipt of hard information concerning the status of the administrative proceedings. It is not enough to express in the strongest terms revulsion at having expedited this appeal while the NLRB failed to expedite its proceedings. Such blatant lack of candor exposes a cynicism that simply will not be tolerated where the executive branch thwarts an attempt by the judicial branch to vindicate the congressional mandate.
 
 
 113
 It may be well to emphasize this court's ruling case law on the limitation to district court injunctions under Sec. 10(j). Speaking through Judge Hastie, we have said that "a pledge of expeditious administrative action is necessarily implicit in a petition for a Section 10(j) injunction. Otherwise, a temporary injunction, entered without reaching the ultimate merits of a dispute may become, in effect, a final disposition of the controversy." Hartz Mountain, 519 F.2d at 144. Without attributing "to anyone an intention to abuse the process of the district court, that can be the result if a Section 10(j) injunction remains in effect overlong," id., we then laid down a rule for the district courts in this judicial circuit:
 
 
 114
 [a Sec. 10(j) ] injunction should include an explicit time limitation, not longer than six months, on the restraint it imposes. If it is believed that injunctive relief or its continuation is warranted after the findings and recommendations of the administrative law judge have been entered, upon proper petition in an appropriate case a district judge may grant or continue a Section 10(j) injunction for an additional period of not more than six months to permit Board action upon those recommendations. Moreover, these six-month limitations shall not preclude a district judge from extending the life of any Section 10(j) injunction for an additional thirty-day period upon a showing that administrative action on the underlying controversy seems to be imminent.
 
 
 115
 Id. By analogy, a six-month period having expired from the date of the district court's hearing, the NLRB's right to any injunction may be totally forfeited because of the delay in the administrative proceedings.
 
 IV.
 
 116
 This too must be said. I am a longtime resident of Greater Pittsburgh and what I know as a person, I will not ignore as a judge. In my lifetime, I have borne witness to the disappearance from our streets of a score of privately-owned commuter bus lines. I have seen the local, state, and federal governments--and their taxpayers--required to fill the gap. They have had to provide passenger service through governmental authorities and government corporations. So all-pervasive is this trend that I need no citation of authority to note that, with minuscule exceptions, the transportation of passengers to, from, and through metropolitan areas has had to become a function of government heavily subsidized by the public fisc. Moreover, I need no citation of authority to record the precarious circumstances of America's largest bus line, the Greyhound Corporation, in 1983, when the company successfully contended that it could survive as an ongoing entity only with a "giveback" of wage cuts of 7.8 percent and a 4 percent employee contribution to the pension plan. After a seven-week strike, the employees accepted a collective bargaining agreement incorporating these features.[9] In the case at bar, Judge Cohill found that "Suburban had been losing money. To require the new employer to be bound by the terms of a contract to which it had not been a party might well sound the death knell for the new company." App. at 1304.
 
 
 117
 Based on the record before the district court, I am convinced that granting the requested injunction prior to any finding of an unfair labor practice could well cause the disappearance of one of the last two or three private commuter bus lines still operating in Greater Pittsburgh. It may well be that as this unfair labor practice proceeding wends its way through the administrative maze at its irresponsibly glacial pace, a final decision of the NLRB may produce exactly that. If this be the case, so be it. But I believe it to be more desirable that the last rites over a lonely survivor of private industry be pronounced by the executive branch of government--after the administrative process has run its course--than by federal judges relying on the Regional Director's evanescent, tissue-thin arguments presented below.
 
 
 
 *
 Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The statute reads:
 The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.
 
 
 [2]
 This action is apparently part of a trend. According to one scholarly work, which was based on interviews with leading officials of the NLRB, a spate of 10(j) cases have arisen in which "employers suffering business declines at plants with expensive union contracts have tried during the contract period to subcontract unit work, shut down a department, or move." See C. Helm, The Practicality of Increasing the Use of NLRA Section 10(j) Injunctions 85-86 & nn. 255-56 (April 15, 1983) (unpublished manuscript on file at Harvard Law School Library)
 
 
 [3]
 The facts presented herein are taken from the testimony before the district court. As set forth below, appellees did not have an opportunity to call witnesses on their own behalf but did have the opportunity to cross examine witnesses called by the appellant. Since the time of the hearing before the district court, there has also been an evidentiary hearing before an administrative law judge of the NLRB. The facts revealed at that hearing differ in significant respects from those before the district court. While we note these divergences where appropriate, our formal review of the evidence is confined to that presented to the district court
 Judge Aldisert notes in his concurrence that, in our narration of the facts of this case, we have gone beyond the findings of fact explicitly made by the district court and have relied on the testimony and evidence that was of record before the district court. While the traditions of appellate opinion writing would alone justify this practice (provided, of course, we distinguished between findings of fact and evidence before the court), there are special reasons that it has been necessary to supplement our narrative in this fashion. As Judge Aldisert correctly observes, we hold in this opinion that the district court erroneously rejected legal theories proffered by the Regional Director. As we shall note, however, see infra at 1084, this error by the district court is not prejudicial unless there were facts in evidence before the district court that made the wrongly rejected legal theories appropriate to the case at bar. Accordingly, we have attempted to present the facts in evidence before the district court that demonstrate the relevance of the wrongly rejected legal theories.
 
 
 [4]
 The financial reports of its accountants show, for example, that in the first quarter of 1982 Suburban suffered a net operating loss of $16,158, or about 3% of the then estimated stockholder's equity of $552,365. The first quarter of the previous year had been even worse
 
 
 [5]
 The bus lines objected to the admissibility of this testimony as hearsay. They further argued that the statements were not admissions by a party opponent. Fed.R.Evid. 801(d)(2). The district court admitted the testimony, subject to later exclusion, apparently on grounds that Hilty's comments were admissions by a party opponent
 In his own testimony before the district court, Hilty did not explicitly deny having made the statements attributed to him by Olczak. There is testimony, however, that would support an inference that he did not make such remarks. Hilty testified, for example, that Shortway did not offer him a position until September 14 and that he did not formally learn until that date that the employees of Suburban would not have jobs with Shortway. There is also testimony that would support Olczak's recollection, though. Hilty testified that at sometime between May and November, a Suburban driver (Don Smith) told him that there was a rumor that Shortway would bring in the Teamsters. Further, there is the following colloquy on cross examination, which might suggest that Hilty knew of Suburban's plans before September 14 and that he disclosed these plans to the drivers:
 Q. You were questioned and testified that Don Smith told you that Shortway--the rumor was that Shortway would bring in the Teamsters. Was this the first you had heard about the possibility of the Teamsters representing the employees in their company?
 A. Yes.
 Q. So any statement you may have made to any employees was based on this information?
 A. Right.
 
 
 [6]
 In his affidavit, Phillips apparently attributed these remarks to Louis Keplar, the president of the ATU. Upon cross-examination, however, Phillips asserted that this attribution had been mistaken and that Hilty rather than Keplar had uttered the remarks
 
 
 [7]
 The record neither supports nor rebuts any causal connection between this decision and the results of the Olczak "poll."
 
 
 [8]
 The Regional Director apparently wished the district court to infer from this evidence that, by decreasing the likely future labor liabilities of whoever ran Suburban's operations, the alleged plot to get rid of the ATU increased the net worth of Suburban as a company. It might also be inferred that the increased value of the Suburban assets resulting from the elimination of the ATU was split between Suburban and Shortway upon sale of the operation
 
 
 [9]
 The report of the administrative law judge, which dismissed the Regional Director's complaint, does not contain any mention of this ongoing hiring. On the contrary, after examining the evidence before him, the administrative law judge found no indication "that anyone was attempting to conceal from the Suburban employees that Respondent Shortway was accepting applications. The employees of Respondent Suburban knew as early as July that there was a possibility that Respondent Suburban was to be sold and that the purchaser might be Shortway or Holland Industries." Suburban Lines, Case 6-CA-15917, slip op. at 15 (December 22, 1983). As we have noted above, however, our review is limited to the record presented to the district court
 
 
 [10]
 It is, of course, quite possible that the misstatement by Mr. Pollack was not the result of deceit or reckless misstatement either on his part or on the part of the bus lines. If this possibility were shown correct, it is extremely doubtful that an unfair labor practice occurred as a result of the misstatements
 
 
 [11]
 We have never been informed precisely why this firing of the Shortway workers is relevant to the 10(j) petition. We presume, however, that the NLRB adduces this evidence to buttress its contention that Shortway's hiring of non-Suburban employees could not be justified by legitimate business purposes. If we are to believe the NLRB's characterization of Shortway as an essentially evil actor plotting to subvert the labor laws, we might also infer from the evidence adduced that Shortway fired or transferred the inexperienced employees it had initially hired as soon as it was confident that one of two conditions applied: either enough former employees of Suburban would have found work elsewhere so that it no longer had to discriminate and keep incompetent employees in order to prevent application of the Burns doctrine, or enough time had elapsed since the purchase of Suburban that even if a majority of its workforce consisted of Suburban employees, the Burns successorship doctrine would no longer apply
 
 
 [12]
 Despite the purported importance of relief in this case, the NLRB has not made rapid progress in processing the complaint toward a final administrative adjudication. It delayed three months before bringing this action. Hearings were not held before the administrative law judge until May and June, 1983, approximately six months after the Regional Director filed his administrative complaint. The delay between the filing of the administrative complaint and the hearing is apparently average for the NLRB, see Weiler, Promises to Keep: Securing Workers' Rights to Self-Organization Under the NLRA, 96 Harv.L.Rev. 1769, 1799-1801 (1983); C. Helm, The Practicality of Increasing the Use of NLRA Section 10(j) Injunctions 6-7, 26-34 (April 15, 1983) (unpublished manuscript on file at Harvard Law School Library), and suggests the inaccuracy of counsel's representations that the case was being handled on an expedited basis. It was not until August 26, 1983, approximately eight months after the complaint was filed, that briefs went before the administrative law judge. On December 22, 1983, almost a year after the filing of this important case supposedly demanding immediate relief, the NLRB's administrative law judge, in a careful, 22-page opinion, found no merit to the Regional Director's complaint and dismissed it in its entirety
 In spite of the adverse holding by the administrative law judge, the Regional Director has not withdrawn his appeal. And despite the purported importance of immediate relief, the Regional Director has requested an extension of over one month to file exceptions to the decision of the administrative law judge. Counsel for the respondents has suggested that "this requested extension represents an unconscionable delay in light of Petitioner-Appellant's continued efforts to secure Section 10(j) injunctive relief." In view of our disposition of the merits of this case, we need not evaluate this contention. We do note, however, that if the Board proceeds at its customary glacial pace--and given a backlog of some 1,500 cases, the unsatisfactory responses of Board counsel on this point, and the past performance of the Regional Director, it is hard to expect otherwise--it will not be until at least early May of 1984, see Weiler, supra, some fifteen months after the administrative complaint was filed, that the NLRB may possibly grant relief in this case, which supposedly demands immediate relief from the courts on an attenuated ("reasonable cause to believe") standard of liability.
 
 
 [13]
 The major distinction between Sec. 10(l ) and Sec. 10(j) is that for the unfair labor practices listed in 10(l ) the NLRB must seek interim injunctive relief from the district court, while section 10(j) gives the NLRB discretion whether or not to seek interim injunctive relief for unfair labor practices not listed in section 10(l )
 
 
 [14]
 In support of this view, the Regional Director apparently argues that, because the Third Circuit equated the scope of appellate review in section 10(j) cases with the scope of appellate review in section 10(l ) cases, and because the scope of appellate review in section 10(l ) cases where an injunction has been denied is plenary, that we should grant plenary review in section 10(j) cases. If this is in fact his argument, he is wrong. First, the characterization of Wellington Nursing Home is inaccurate. We held there only that the district court 's reasonable cause standard in section 10(j) cases should be the same as the district court 's reasonable cause standard in section 10(l ) cases. More to the point, even if the scope of review in section 10(l ) cases and section 10(j) cases is the same, there is a split in the circuits as to what that review should be, and this circuit has never held that the scope of review in 10(l ) cases is plenary. Thus, the second premise underlying the argument is either false or irrelevant
 
 
 [15]
 As a practical matter, such an asymmetry might well reduce the real burden on the NLRB in 10(j) cases to something lower than even "reasonable cause."
 
 
 [16]
 Application of the suggested dual standard is fully consistent with this Court's holding in Wellington Nursing Home, for in that case, there was no legal issue of substance in question. The opinion of the court shows the case to involve a simple discriminatory discharge. The only issue of importance to the reasonable cause finding was whether the Board's circumstantial evidence of intent sufficed. The panel, applying a clearly erroneous standard, held that it did. 651 F.2d 902 (3d Cir.1981)
 
 
 [17]
 The concurrence of Judge Aldisert argues that our holding on this score implies that a successor company has some duty to hire employees of its predecessor. Otherwise, the concurrence asserts, we could not ignore the district court's finding (which was not clearly erroneous) that no employee of Suburban applied to Shortway. We do not believe the implication suggested by Judge Aldisert necessarily follows either from our opinion or from our acquiescence to the cited finding of the district court. There may indeed be no duty of a successor employer to hire the employees of its predecessor. As we have tried to make clear, however, this statement of law does not mean that the successor employer may take any affirmative or discriminatory steps to prevent employees of the predecessor corporation from applying for work
 
 
 [18]
 We believe that both these legal theories were adequately presented to the district court. In his oral argument opposing respondent's motion to dismiss the petition for injunctive relief, the NLRB attorney recounted what he regarded as the concealment of Suburban and Shortway and said that it would have been futile for Suburban employees to apply. Specifically, he stated:
 We have cited numerous cases in our brief including the Love's Barbecue case and including the Foodway of El Paso case, where even though individuals who had not applied for employment, the board and courts have ordered that employer to reinstate the individuals because of the type of conduct that the employer engaged in in concealing or misleading the employees or the union as to how to secure employment.
 This presentation to the trial judge is more than adequate to preserve the issue on appeal.
 
 
 [19]
 Our citation of Kallmann and Packing House should not be construed as constituting Third Circuit approbation of the legal principles announced in those cases. Rather they are cited only as support for the proposition that the NLRB's arguments were not frivolous
 
 
 [20]
 The testimony is as follows:
 "Q When was the first that you were offered employment at Shortway Suburban?
 "A Sometime around the first of January [of 1983]....
 "Q And was this to a position where the Teamsters would be representing you?
 "A As far as I knew; yes, sir.
 "Q And did this have any effect on your decision to refuse this offer?
 "A I don't believe so.
 "Q Well, why didn't you accept that offer to go back?
 "A Because of the low wage. I felt I couldn't live with the hourly wage and drive as far as I had to, to go back and forth to work.
 "Q Did you want the Teamsters to represent you?
 ....
 "THE WITNESS: I don't want the Teamsters but if it would have been a good enough paying job, I would live with them."
 
 
 [21]
 Because of our disposition of the "just and proper" issue, there is no occasion for a remand to address these defenses
 
 
 [22]
 The relevant passage in Brown reads as follows:
 The employers further contend that the granting or denial of such injunctive relief is within the discretion of the district court and cites our opinion in Bankers' Utilities Co. v. National Bank Supply Co., 9 Cir., 53 F.2d 432, at page 433 [ (1931) ], which states: "By an application for a temporary injunction, the discretion of the court is appealed to, and, unless the showing presented on undisputed facts is such as to entitle the moving party as a matter of law to the writ sought, the decision of the trial judge may not be disturbed. That rule needs no citation of authorities to support it."
 In view of the irreparable harm which the designated unions may suffer by the drifting away of their members to the union favored by the employers, we think the law entitles the Board to the injunctive relief sought. Cf. Le Baron v. Los Angeles Building & Const. Trades Council, D.C., 84 F.Supp. 629, 636 [ (1949) ], affirmed 9 Cir., 185 F.2d 405 [ (1950) ].
 218 F.2d at 544. In its reply brief at 17, the Regional Director argues that the Brown court "rejected the employer's argument that the denial of relief was sustainable under the abuse of discretion standard, even if it were erroneous."
 
 
 [23]
 The relevant passages of Local 83 read as follows. In text, the Ninth Circuit writes:
 To set aside an order granting a temporary injunction under Section 10(l ) of the Act, it must appear that the District Court's finding that there was reasonable cause to believe that the Act was being violated was clearly erroneous. Warehousemen's Union v. Hoffman, 302 F.2d 352 (9th Cir.1962)[1].
 The first footnote, which follows the citation to Warehousemen's reads:
 Because of the Congressional policy favoring the granting of temporary injunctions under Section 10(l ) of the Act in order to prevent irreparable harm, we do not so limit our scope of review when an injunction is denied. See Brown v. Pacific Telephone and Telegraph Company, 218 F.2d 542 (9th Cir.1954).
 
 
 [24]
 One exception might be Boire v. Pilot Freight Carriers, Inc., 515 F.2d 1185, 1193 (5th Cir.1975), where, in declining to order injunctive relief, the court stated, "The Chancellor does not abdicate his powers merely upon a showing that the Regional Director's theories surpass frivolity." Whether this rhetorical flourish can be taken for a holding that the range of discretion of the district judge in 10(j) cases is equivalent to that of the chancellor is unclear
 
 
 [25]
 The Senate Report on the bill that was to become Sec. 10(j) states:
 [t]ime is usually of the essence on these matters and consequently the relative slow procedure of the Board hearing and order, followed many months later by an enforcing decree of the circuit court of appeals, falls short of achieving the desired objective--the prompt elimination of the obstructions to the free flow of commerce and encouragement of the practice and procedure of free private collective bargaining. Hence we have provided that the Board, acting in the public interest and not in vindication of purely private rights, may seek injunctive relief in the case of all types of unfair labor practices....
 Experience under the National Labor Relations Act has demonstrated that by reason of lengthy hearing and litigation enforcing its order, the Board had not been able in some instances to correct unfair labor practices until after some substantial injury has been done .... [I]t has sometimes been possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible to restore or preserve the status quo pending litigation.
 S.Rep. No. 105, 80th Cong., 1st Sess. 8, 27 (1947).
 
 
 [26]
 Because we find that the district court's denial of interim injunctive relief can be sustained simply by applying the principle of section 10(j) law we have just discussed, we have no need here to consider fully whether there is not another principle of section 10(j) law that could guide the district court's discretion in determining the justice and propriety of interim injunctive relief. An argument can be made, though, that the district court should cognize in addition that section 10(j) was reserved for the extraordinary case and that it was not intended to undermine the normal processes of labor law adjudication: administrative resolution by the NLRB followed, if necessary, by enforcement in the courts of appeals. Section 10(j) was largely a compromise measure designed to placate pro-union opponents of section 10(l ), which limited the Norris-LaGuardia Act's prohibition on temporary injunctions. While section 10(l ) directed the NLRB to seek temporary injunctive relief when labor unions committed various transgressions, section 10(j) at least authorized it to seek temporary injunctive relief when employers committed unfair labor practices. Support for the understanding that section 10(j) was intended to be reserved for extraordinary cases could also be drawn from the recent demise of the Labor Law Reform Act that would have forced Board officials to seek 10(j) injunctions in almost all discriminatory discharge cases. See H.R. 8410, 95th Cong., 1st Sess. Sec. 10 (1977) (amending section 10(l )). See also C. Helm, supra note 2, at 1078 & n. 8 (discussing proposed change)
 The principle we have suggested may be implicit in section 10(j) appears to be similar to that which motivated the Eighth Circuit in Minnesota v. Mfg. Corp. v. Meter, 385 F.2d 265 (8th Cir.1967), to require that the case be "extraordinary" before 10(j) relief would be granted. The focus we foresee, however, would not be on the egregiousness of the unfair labor practice--the reasonable cause standard would settle the issue of wrongdoing--but on the unusual likelihood (compared to other cases before the Board) of ultimate remedial failure.
 
 
 [27]
 The district court need not, that is, accept delay in the NLRB adjudicative process as an immutable law of nature. If the district court has good reason to believe that interim injunctive relief would not be necessary were the Board to proceed at a rate consonant with effective use of its resources, it may deny interim injunctive relief even where the Board, by acting at its customary pace, prevents itself from effectively exercising the powers bestowed upon it by Congress
 Moreover, as we intimated in the Wellington Nursing Home decision, see 651 F.2d at 907 (citing Boire v. Pilot Freight Carriers, 515 F.2d 1185, 1193 (5th Cir.1975), cert. denied, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976)), delay by the Board constitutes relevant (though not dispositive) evidence that interim injunctive relief is not truly necessary. The theory here, we stress, is not one of laches--that traditional basis for denying equitable relief applies only where there is prejudice to the opposing party--but rather that the district court may legitimately think it suspicious that the party who asks to preserve the status quo through interim injunctive relief has allowed the status quo to change through unexplained delay. We have commented on the Board's delay in this case, but, in view of our disposition on other grounds, need not consider this point further.
 Judge Aldisert in his concurrence has argued forcefully that the Board is guilty of laches in this case. We question, however, whether the bus lines have made the necessary showing of prejudice caused by the Board's delay. The "prejudice" cited by the concurrence would seem to be inherent in any interim reinstatement order issued under section 10(j) whether or not the Board delayed. This "prejudice," however, has already been rejected in this circuit as a basis for automatically denying section 10(j) relief. See infra typescript at 1094. We also question whether there was an adequate factual record presented in this case for the bus lines to satisfy their burden of proof, for purposes of laches, that the Board was guilty of unreasonable delay.
 
 
 [28]
 The key passage of the district court's opinion summarizing its belief reads as follows:
 Petitioner has earnestly argued that any relief eventually granted in the underlying case will be rendered meaningless by the passage of time. Petitioner further contends that the status quo as of October 29, 1982, must be restored. We are constrained to disagree. We are at a loss to understand why ultimate relief from the Board will be in any way meaningless. If the members of the charging party have obtained better jobs in the interim, they will, of course, be free to keep them, but we see no reason why back pay and reinstatement will not make them just as whole as any relief we could grant.
 Given the size and intimacy of A.T.U., Local 1543, we have no reason to think that it could not swiftly and effectively reconstruct itself should the Board uphold its charge. Today, April 20, 1982, we are nearly six months beyond the status quo the petitioner wishes us to "maintain" by affirmative injunction. Given the highly effective remedies available from the Board should it find for the charging party, we could not deem it just and proper to order the sweeping relief requested by the petitioner, even were there sufficient facts to support this reasonable cause finding.
 
 
 [29]
 The objection by the Mack court to interim reinstatement is stated as follows:
 Admittedly any organizational efforts may remain temporarily stymied by denial of interim reinstatement, but the probability of stalling such efforts against the potential losses to innocent bystanders, the present employees, suggest the more conservative course of action.
 Mack, 471 F.Supp. at 1125.
 
 
 [30]
 The objection of the Fabsteel court was stated as follows:
 If the court wrongly issues an injunction, a substantial (approximately 30) number of people will be mistakenly thrown out of work until the Board acts and this injunction is dissolved. This would wreak havoc and chaos in the lives of such unoffending individuals and the plant. But if the court fails to issue the injunction and the Board and appellate courts disagree, the strikers will be returned to work, and they will still have the remedies of back pay and restored seniority in the plant.
 Fabsteel, 427 F.Supp. at 318.
 
 
 [31]
 The extent of the NLRB's own belief in this assertion is open at least to some question. When asked by a member of this panel how it vindicated the policies of the NLRA for members of the workforce to seek employment under more attractive conditions elsewhere, counsel for the Regional Director responded that many of the workers might not find jobs elsewhere, i.e. might not be "scattered to the four winds." In fairness, however, earlier remarks of counsel intimate that this admission may have been limited to an assertion that the Suburban workers might not have found more attractive jobs elsewhere
 
 
 [32]
 This is not to say that such evidence does not exist. Professor Weiler has cited studies showing that fewer than five percent of reinstatement offers are accepted when made more than six months after unfair labor practice complaints are filed. See Weiler, supra note 12, at 1793. On average, it apparently takes fifteen months between the time of an unfair labor practice charge being filed and the time of a board order. Id. at 1796
 
 
 [33]
 We are further comforted in our acceptance of the district court's exercise of discretion in this case by its notation that the Board delayed in bringing this action. As we have explained, insufficiently explained delay provides some probative evidence that interim injunctive relief was not entirely essential
 
 
 [34]
 The general propriety of issuing Gissel bargaining orders in actions brought under section 10(j) is a much mooted issue. See generally Note, The Propriety of Section 10(j) Bargaining Orders in Gissel Situations, 82 Mich.L.Rev. 112 (1983) (summarizing caselaw and advocating such orders, but only where there is a "high probability" that the NLRB will ultimately issue such an order). Here, however, the precondition for Gissel, card support for a particular collective bargaining representative, has not been met. Nor is it even remotely likely, given our upholding of the district court's denial of interim reinstatement, that the preconditions for Gissel will exist at any time prior to the NLRB's ultimate determination of this case
 
 
 [1]
 Professor Maurice Rosenberg is fond of what he calls the "well known fable:"
 [t]hree baseball umpires [are] arguing about how they distinguish balls and strikes during the game. The first one says: "It's simple. I call 'em as I see 'em." The second one snorts: "Huh! I call 'em as they are!" And the third ends the debate with: "They ain't nothin' 'till I call 'em!"
 Rosenberg, Judicial Discretion of the Trial Court, Viewed From Above, 22 Syracuse L.Rev. 635, 640 (1971). I take the position that testimony and evidence adduced at a hearing or trial "ain't facts until the factfinder calls 'em."
 
 
 [2]
 The court found:
 Suburban is a closely held, private corporation. There are 737 shares of stock outstanding. Jilldous C. Hilty, president of Suburban, owns 77 shares of the stock. Three of the union members who are bus drivers own stock. Frank Olczak owns 10 shares, Ray Kirshner 30 shares and Rich Gregg 10 shares. [These] three union members own 50 of 737 shares, or about 7 percent of the stock.
 App. at 1297.
 
 
 [3]
 Section 10(l ) provides:
 Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 158(b) of this title, or section 158(e) of this title or section 158(b)(7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law ....
 29 U.S.C. Sec. 160(l ).
 
 
 [4]
 My extravagant language is lifted from a lovely expression of Alexander M. Bickel. See Bickel, Foreword: The Passive Virtues, The Supreme Court 1960 Term, 75 Harv.L.Rev. 40, 51 (1961)
 
 
 [5]
 W. & M. SAHAKIAN, IDEAS OF GREAT PHILOSOPHIES 11-23 (1966)
 
 
 [6]
 The majority, for example, unnecessarily and gratuitously injects into its analysis an inflammatory hypothetical--not present or suggested in this case: "Posting a sign, for example, that reads 'No Blacks Need Apply' or that reads 'No Union Members Need Apply' and that succeeds in its objectives is just as effective (and just as offending) a method of discrimination as a point-blank refusal to hire ...." Maj. op. typescript at 1086. This of course is the classic material fallacy of Argumentum ad Populum, an appeal to strong feelings of the multitude
 
 
 [7]
 What the Union seeks here is completely at odds with the basic principles this Court elaborated in Burns. We found there that nothing in the federal labor laws "requires that an employer ... who purchases the assets of a business be obligated to hire all of the employees of the predecessor though it is possible that such an obligation might be assumed by the employer." 406 U.S., at 280 n. 5 [92 S.Ct., at 1578 n. 5]. See also Golden State Bottling Co. v. NLRB, supra, 414 U.S. at 184 n. 6 [94 S.Ct. 414 at 425, 38 L.Ed.2d 388]. Burns emphasized that "[a] potential employer may be willing to take over a moribund business only if he can make changes in corporate structure, composition of the labor force, ... and nature of supervision." 406 U.S., at 287-288 [92 S.Ct., at 1582-1583]. We rejected the Board's position in part because "[i]t would seemingly follow that employees of the predecessor would be deemed employees of the successor, dischargeable only in accordance with provisions of the contract and subject to the grievance and arbitration provisions thereof. Burns would not have been free to replace Wackenhut's guards with its own except as the contract permitted." Id., at 288 [92 S.Ct., at 1582]. Clearly, Burns establishes that Howard Johnson had the right not to hire any of the former Grissom employees, if it so desired
 Howard Johnson, 417 U.S. at 261-62, 94 S.Ct. at 2243-44.
 
 
 [8]
 The court observed, inter alia:
 We must not lose sight of the fact that this matter is pending before the NLRB and has been for six months .... To assert that on the basis of some alleged unfair labor practices, this court is to put the former complement of employees out of work is manifestly unjust.
 App. at 1304.
 It also considered the sine qua non of any preliminary injunction proceeding--the presence or absence of irreparable harm:
 We are at a loss to understand why ultimate relief from the Board will be in any way meaningless. If the members of the charging party have obtained better jobs in the interim, they will, of course, be free to keep them, but we see no reason why back pay and reinstatement will not make them just as whole as any relief we could grant.
 Given the size and intimacy of A.T.U., Local 1543, we have no reason to think that it could not swiftly and effectively reconstruct itself should the Board uphold its charge.
 App. at 1308-09. This issue is not new to this court.
 The relationship of monetary damages to proof of irreparable harm is always central to the question of granting a preliminary injunction by a federal court. This court has repeatedly emphasized "the elementary principle that a preliminary injunction shall not issue except upon a showing of irreparable injury." National Land & Investment Co. v. Specter, 428 F.2d 91, 97 (3d Cir.1970); see also A.O. Smith Corp. v. FTC, 530 F.2d 515, 525 (3d Cir.1976). We have explained that preliminary injunctive relief is not available when adequate monetary damages are available:
 [T]he requisite is that the feared injury or harm be irreparable--not merely serious or substantial. "The word means that which cannot be repaired, retrieved, put down again, atoned for .... Grass that is cut down cannot be made to grow again; but the injury can be adequately atoned for in money. The result of the cases fixes this to be the rule: the injury must be of a peculiar nature, so that compensation in money cannot atone for it ...." Gause v. Perkins, 3 Jones Eq. 177, 69 Am.Dec. 728 (1857). "Irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate." Danielson v. Local 275, Laborers Union, 479 F.2d 1033, 1037 (2d Cir.1973).
 A.O. Smith Corp. v. FTC, 530 F.2d at 525. See E. Re, Equity and Equitable Remedies 1018-20 (1975).
 Goadby v. Philadelphia Electric Co., 639 F.2d 117, 121 (3d Cir.1981). As the district court correctly found, concurred in by the majority, no such irreparable harm would result here from denying injunctive relief and allowing the Board to resolve the unfair labor practice controversy.
 
 
 [9]
 N.Y. Times, Dec. 20, 1983, at 1