William A. PASCARELL, Regional Director of Region 22 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

GITANO GROUP, INC. d/b/a Gitano Distribution Center, Respondents.

Civ. A. No. 89–3997.

United States District Court, D. New Jersey.

Feb. 13, 1990.

Marguerite R. Greenfield, N.L.R.B., Region 22, Newark, N.J., for petitioner.

Adin C. Goldberg, Spengler Carlson Gubar Brodsky & Frischling, and Steven M. Gerber, General Counsel, The Gitano Group, Inc., New York City, for respondents.

## OPINION

WOLIN, District Judge.

This matter is before the Court on a petition filed by the Regional Director of Region 22 of the National Labor Relations Board (the "NLRB" or the "Board"), pursuant to § 10(j) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(j) ("the NLRA"), for a temporary injunction pending the final disposition of this action. The filing of this petition follows the issuance of an unfair labor practice complaint pursuant to NLRA § 10(b), upon charges filed by United Automobile, Aerospace & Agriculture Implement Workers of America, AFL–CIO (the "Union") alleging that respondent Gitano Group, Inc., d/b/a Gitano Distribution Center ("Gitano") has engaged in, and is engaging in, unfair labor practices within the meaning of NLRA § 8(a)(1), (3), and (5).

The NLRB asserts that Gitano has discriminated against Union employees by laying off and refusing to reinstate employees because of their support for the Union, and that Gitano has refused to recognize and bargain with the Union concerning a unit of employees at Gitano's two New Jersey warehouses. Gitano has filed an answer to the Board's petition for injunctive relief along with a memorandum opposing such relief because there is no reasonable cause to believe the NLRA was violated and the relief sought is not just and proper. As there has been no objection to the Board's motion to rely on the administrative record for evidence on the reasonable cause issue, the Court will rely on that evidence and the testimony presented before the Court on November 3, 1989. After review of the administrative record, the testimony before the Court and the submissions of the parties, the Court finds that there exists reasonable cause to believe that a violation of the NLRA and that injunctive relief would be just and proper to effectuate the purposes of the NLRA. Therefore, the Board's petition for injunctive relief pursuant to § 10(j) will be granted.

## I. BACKGROUND

A. *Prior Proceedings*

The Gitano Group, Inc., is a holding company which, through its subsidiaries and

affiliated companies, imports and sells men's, women's and children's clothing. Prior to 1986, Gitano's warehouse and distribution operations were located in Linden, New Jersey. Beginning in 1986, Gitano relocated its operations to a warehouse facility in Edison, New Jersey. The employees at Edison were employed by at least two wholly-owned subsidiaries of Gitano, Orit Corporation ("Orit") and North American Underwear Company ("NAU"). From 1987 to December, 1988, Gitano also operated a satellite warehouse operation one building away from their Edison warehouse known as the "Crazy Eddie" warehouse.

In March, 1987, the Board issued a Decision and Direction of Election, directing that an election be held among Gitano's warehouse employees in Edison. In August, 1987, an election was held among Orit and NAU employees in Edison which determined that a majority of the employees voting wanted the Union to represent them. The Board certified the Union to represent "the full-time and regular part-time warehouse employees employed by the Employer [Gitano] at its Edison, New Jersey warehouse, excluding all office clerical employees, professional employees, guards and supervisors as defined in the Act" in September, 1987. Gitano refused to bargain with the Union, contesting the Board's decision regarding the appropriateness of the bargaining unit among other objections. The Board found that Gitano had violated NLRA § 8(a)(5) and ordered Gitano to bargain. 288 NLRB No. 2, 129 L.R.R.M. 1086 (1988). The Board's decision was enforced by the Third Circuit. *N.L.R.B. v. Orit Corporation, et al.,* 866 F.2d 1411 (3d Cir. 1988).

In November, 1987, employees from the bargaining unit engaged in an unfair labor practice strike. In December, 1987, Gitano denied the returning strikers their reinstatement rights under the NLRA. After an unfair labor practice charge was filed by the Union, the Board obtained § 10(j) injunctive relief from this Court. *Pascarell v. Orit Corp.,* 705 F.Supp. 200 (D.N.J.) (Wolin, J.), *aff'd mem.* 866 F.2d 1412 (3d Cir.1988). Contempt proceedings were sub-

sequently brought against Gitano by the Board, alleging that Gitano had failed to fully comply with this Court's order. In May, 1989, the Board's issued a Decision and Order which ordered Gitano to reinstate the unfair labor practice strikers and make them whole. *Orit Corp.,* 294 NLRB No. 55, 132 L.R.R.M. 1047 (1989). The Board is currently seeking enforcement of that decision.

### B. *The Instant Case*

In June, 1988, Orit entered into a lease for, and began to occupy a warehouse facility at 1111 Corporate Road in North Brunswick, New Jersey, approximately twelve miles from its existing Edison facility. At that point Gitano hired approximately 8 new employees in North Brunswick to work on the P.S. Gitano product line and thereafter received most new merchandise in that product line at the North Brunswick facility. Transcript of Proceedings before the ALJ ("Tr.") 155, 180, General Counsel Exhibit ("GCX") 16. Previously that product line had been split between the Edison facility and the Crazy Eddie warehouse, with most of the merchandise received at the Crazy Eddie warehouse. No Edison warehouse employees were transferred to North Brunswick during this period, although one Edison supervisor was promoted to manage the North Brunswick warehouse. Tr. 162, 628. Gitano did not advise the Union of this relocation at that time. Tr. 233.

The Union first heard rumors of the existence of the North Brunswick facility in August, 1988. NAU employee Delia Collado testified that NAU Warehouse Manager Joseph Gabay announced to employees in August, 1988, that it was possible that the NAU operation would be transferred to North Brunswick and asked for employee comments. Tr. 299–300. By letter dated August 11, 1988, the Union requested that Gitano bargain about the effects of a possible relocation. GCX 2. Gitano did not respond. Tr. 20–21. The lease for North Brunswick also provided that additional space would become available in the warehouse in September, 1988. In September,

Mr. Gabay viewed the North Brunswick space and recommended to Gitano's senior management that it be allocated for use by NAU. Respondent's Brief in Opposition ("Opp. Br."), p. 4.

In December, 1988, Gitano recognized the Union as the bargaining agent for the Edison employees. On December 12, 1988, the parties held their initial meeting and discussed the mechanics of upcoming contract negotiations. No mention of any proposed relocation of the NAU operations was made at this meeting by Gitano. Tr. 22. By letter dated December, 16, 1988, which was received on, or around, December 19, Gitano informed the Union that all NAU operations would be transferred from Edison to North Brunswick and that all employees currently working for NAU in Edison would be laid off. Tr. 22–23; GCX 3. The letter indicated that the transfer and lay-off would take place "on or about December 30, 1988." At that time approximately 74 employees worked in the NAU operation at Edison.

The Union's attorney contacted Gitano on December 23, 1988 and requested a meeting between the parties to discuss the effects of the relocation and lay-off. Gabay hired twelve new employees on December 27, 1988 to work at the new NAU operation at North Brunswick. GCX 14. Previously, Gabay had worked with these individuals at another company. Apparently these workers left their prior employment specifically to work for Gabay.

When the parties met on December 29, 1988 Gitano advised the Union that all of the NAU operations which had been previously conducted in Edison would be moved to the new facility in North Brunswick and that all of the warehouse employees currently working for NAU in Edison would be laid off. Tr. 671–72. The Gitano representatives explained that the move to North Brunswick was necessitated by a need for additional space and the desire to have NAU employees perform all aspects of its operations. At that meeting Gitano projected a work force in North Brunswick of approximately 60 employees and informed the Union that about 20 workers

had already been hired and were currently working in North Brunswick. Gitano agreed to delay the lay-offs for two weeks and to continue discussions with the Union on January 5, 1989. Tr. 690. Based on the representations made by Gitano at the meeting the Union demanded recognition at the North Brunswick facility. Tr. 672–73. The Union also claims that it did not waive the opportunity to submit applications for transfer on behalf of the Union employees. GCX 38. The Union also requested lists of all of the employees in the bargaining unit in Edison who would be laid off and all of the employees in North Brunswick who had recently been hired.

Gitano hired an additional 30 new employees at North Brunswick on January 3, 1989 and January 4, 1989. GCX 14–15. At the January 5, 1989 meeting Gitano provided the Union with a list of all NAU and Orit employees in Edison. Gitano refused to provide the Union with a list of employees in North Brunswick, taking the position that these employees were not part of the bargaining unit and were irrelevant to the discussions between the parties. The Union demanded that Gitano transfer all NAU Edison employees to the NAU North Brunswick facility. The Union stated that it was its position was that if it were necessary, the newly hired employees in North Brunswick should be fired in order to make room for the transferred Edison employees. Gitano refused, stating that the laid off employees would be considered for future job openings in North Brunswick and in Edison (in the Orit operation) on the subjective criteria of productivity, performance and ability. The Union made a blanket application on behalf of all the NAU Edison employees and proposed that seniority be the criteria by which the employees were either transferred or recalled. Gitano accepted the blanket application and rejected the proposal to use seniority as the basis for making its lay-off/transfer decisions. At the close of the meeting, Gitano informed the Union that the lay-offs would commence the next day. Tr. 75–76, 679.

Gitano laid off 64 NAU Edison employees on January 6, 1989. The eleven remaining employees completed their assign-

ment and were then directly transferred to North Brunswick. By January 21, 1989, Gitano had recalled one employee to work in North Brunswick and eleven employees to Edison. Fifty-one employees still remained on lay-off. GCX 13. As of June 30, 1989 Gitano had hired a total of, approximately, 114 new employees at North Brunswick, and had recalled almost one third of the 64 employees who had been laid off. Approximately 38 employees remain on lay-off. Tr. 724–25, GCX 13. The Court notes that both parties find it difficult to calculate an exact figure as to how many employees are still on lay-off and are able and willing to return to work.

Another meeting between the parties was scheduled for January 6, 1989. This meeting was cancelled by the Union. A Union representative testified at the hearing before the ALJ that the Union hoped to "fold in" the lay-off discussions with the regular negotiations between the Union and Gitano. However, apparently, discussions concerning the lay-offs were not conducted by the parties after this point.

## II. DISCUSSION

■ On a petition for injunctive relief pursuant to § 10(j) of the National Labor Relations Act, a federal court must determine whether "reasonable cause" exists to believe an unfair labor practice has occurred and whether the specific relief sought is "just and proper". *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076 (3d Cir.1984). Unlike the showing necessary to receive a preliminary injunction, injunctive relief under § 10(j) may be imposed without a showing of irreparable harm or a likelihood of success on the merits. *Id.* Indeed, the Third Circuit has stated that the necessary standard on an application for injunctive relief pursuant to § 10(j) involves a relatively "low threshold of proof". *Eisenberg v. Wellington Hall Nursing Home*, 651 F.2d 902, 905 (3d Cir. 1981). See also *Kobell, supra,* 731 F.2d at 1084 (standard is "relatively insubstantial").

■ In determining whether "reasonable cause" exists to believe that an unfair la-

bor practice has occurred, a district court does not have general jurisdiction over the nation's labor laws and may not decide whether or not to issue relief based on its own belief as to whether an unfair labor practice has been committed. *Kobell*, 731 F.2d at 1083. However, the district court "need not be satisfied with the 'validity of the legal theory upon which [the Regional Director] predicated his charges,' so long as the legal theory proffered is 'substantial and not frivolous'...." *Id.* at 1084, quoting from *Hirsch v. Building and Construction Trades Council*, 530 F.2d 298 (3d Cir.1976).

■ The determination that the relief sought is "just and proper" requires a finding by the court that "it is in the public interest to grant the injunction, so as to effectuate the policies of the National Labor Relations Act or to fulfill the remedial function of the Board." *Eisenberg v. Lenape Properties, Inc.*, 781 F.2d 999, 1003 (3d Cir.1986) (citations omitted). The Third Circuit has instructed district courts to "discuss and determine whether the failure to grant interim injunctive relief would be likely to prevent the Board, acting with reasonable expedition, from effectively exercising its ultimate remedial powers." *Kobell*, 731 F.2d at 1091–92 (footnote omitted). The Third Circuit has stated that the district court must make one of two findings before denying interim injunctive relief.

[The district court] must find there to be no legal theory implicit or explicit in the regional director's argument that is substantial and not frivolous. Alternately, the district court must find insufficient evidence—at least taking the facts favorable to the Labor Board—to support any non-frivolous theory appropriate to the case at bar.

*Kobell,* 731 F.2d at 1084.

The Board contends that reasonable cause to believe that the National Labor Relations Act has been violated and that § 10(j) injunctive relief is just and proper can be found by a review of the administrative record below. In contrast, respondent asserts that neither "reasonable cause" to

believe that an unfair labor practice has occurred nor proof that imposition of an injunction by this Court would be "just and proper" has been shown by the Board or evidenced by the administrative record. Because as set forth below this Court is more persuaded by the arguments of the Board, interim injunctive relief shall be granted.

A. *The "Reasonable Cause" Requirement*

1. The Lay–Off and Refusal to Transfer

■ The Board alleges that there is reasonable cause to believe that Gitano violated NLRA § 8(a)(3) by its lay-off and refusal to transfer a substantial number of NAU/Edison employees to the North Brunswick warehouse facility because of their support for the Union. There is no dispute between the parties that the theory on which the Board relies is "substantial and not frivolous." The legal theory of the Board's complaint is well-grounded in law. *See e.g. N.L.R.B. v. National Car Rental System, Inc.*, 672 F.2d 1182, 1186–87 (3d Cir.1982).

The Third Circuit has held that "[i]n order to find a violation of section 8(a)(3) ... the Board must first find that [the employer] engaged in conduct ... that discriminated against union members in a way that could have adversely affected their employee rights. Second, that discriminatory conduct constitutes an unfair labor practice if it meets the standards set forth in *N.L.R.B. v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798 [18 L.Ed.2d 1027] (1967)." *National Car Rental*, 672 F.2d at 1186. The Supreme Court held that the Board may apply a two-tiered approach to finding an unfair labor practice in this situation. The Board may find an unfair labor practice solely on the finding that an employer's conduct is "inherently destructive" of employee rights. *Great Dane*, 388 U.S. at 34, 87 S.Ct. at 1798. However, if the Board finds that the adverse impact on employee rights is "comparatively slight," then the Board must also find an anti-union motivation, if the employer has come forward with evidence of a legitimate and substantial business reason, in order to find a violation of § 8(a)(3). *Id.*

Gitano does not dispute several factual allegations of the Union and the Board from which the Board could conclude that the lay-off has had a disparate effect on presumed Union supporters. The record clearly shows that Gitano insisted basing its transfer and lay-off decisions on the subjective attributes of "productivity, performance and ability." Opp. Br., p. 21. The Court does not find that this basis is *per se* discriminatory. However, there is no evidence in the record that employees were objectively evaluated and rated by their supervisors, or the warehouse manager, before the lay-off decision was made. Apparently, the determination as to whether an Edison employee was productive was left to the subjective remembrance of Mr. Gabay. There is evidence in the record that this criteria was not uniformly applied to employees in Edison and employees in North Brunswick. The Union's argument presented at the January 5th meeting is well taken. It is puzzling why Gitano should have concluded that all of its newly-hired workers in North Brunswick were more productive, had more ability, and performed better, than the unionized NAU employees in Edison. It is also interesting to note that all of the employees who were offered transfer to North Brunswick had been hired since the commencement of the 1987 unfair labor practice strike. *See* Petitioner's Brief in Reply ("Reply Br."), p. 13. The inference that Gitano used the "productivity" criteria to discriminate against Union supporters can be reasonably drawn in light of the circumstances of this case.

The Board has also placed evidence in the record from which the ALJ and ultimately, the Board, may find union animus. Against the backdrop of the tortured history of labor relations between Gitano, the Union and the Board, the announcement and timing of these lay-offs may be found to be indicative of a discriminatory motive by Gitano. It is undisputed that members of Gitano's management knew about the relocation of certain segments of Gitano's operations far in advance of Gitano's offer

to bargain over their effects. It is also undisputed that at the December 12 introductory meeting between Gitano and the Union, no mention of the possibility of lay-offs was made, although it is certainly reasonable to infer that, by this time, Gitano knew of its plans to relocate. Also, attorneys for Gitano misstate the administrative record when they claim that:

> As the evidence before the administrative law judge shows, [Gitano] gave the Union ample notice of its decision to close the Edison operation and to lay-off workers there, and ample opportunity to propose transfer rights, before a single North Brunswick employee was hired.

Opp. Br., p. 20. The evidence shows that the Union was notified of the impending closure of the Edison operation and the lay-off of all unit employees by letter dated December 16, 1988. GCX 3. That letter stated that the lay-offs were to occur on December 30, 1988 and that a discussion of the effects could begin at "your earliest convenience." The record also reflects the fact that new employees were hired off the street to work at the NAU facility in North Brunswick in late December and early January, during the negotiations over the effects of the lay-offs. The Court does not believe that these facts constitute a showing that Gitano gave the Union sufficient time to prepare for the relocation of the operation and the lay-off of the unit employees. Inferences as to motive may be reasonably drawn from the evidence that the Board placed before the ALJ.

The Court finds little relevance or merit in the argument by Gitano that because the Union allegedly made no proposal to transfer Edison employees at the first negotiating meeting on December 28 or 29 it is somehow estopped from doing so now. Gitano is apparently arguing that the only reason it hired between 30 and 35 new employees at the New Brunswick facility between the December meeting and the January meeting was because the Union did not propose a transfer. This contention is without merit and finds no support in the record. Gitano also maintains that allegations of transportation problems provide it with a legitimate justification for failing to transfer the NAU/Edison employees. The record does not support the allegation that this justification impacted on the transfer/lay-off issue. See Tr. 490–91. Therefore, the Court finds that there are sufficient facts in the record to support the legal theory on which the Board relies.

2. Recognition in North Brunswick

The Board contends that it has reasonable cause to believe that Gitano's failure to bargain with the Union with respect to the Orit and NAU employees at the North Brunswick warehouse violates NLRA § 8(a)(5) in that Gitano's conduct constituted a partial withdrawal of recognition of the Union. Gitano contends that the Decision and Order of the NLRB directing Gitano to recognize and bargain with the Union as representative of the unit employees in Edison does not cover the employees in question at the North Brunswick facility and that, therefore, Gitano had no duty to bargain with the Union concerning those employees. Gitano does not dispute, and the Court so finds, that Gitano has succeeded to the bargaining obligations of its subsidiaries, Orit and NAU.

■ The theory on which the Board relies is that Gitano's North Brunswick warehouse is properly included in the collective bargaining unit because the company simply relocated portions of the Gitano operations at a nearby location, and that, therefore, the refusal to recognize the Union in North Brunswick constitutes an unlawful withdrawal of recognition. The Court finds that this theory is "substantial and not frivolous." See N.L.R.B. v. Paper Manufacturers Co., 786 F.2d 163, 167–68 (3d Cir.1986). Gitano's lengthy discussion of the accretion theory as applied to the facts of this case misses the point. This Court examines only the theory on which the Board relies to be certain that it is substantial and not frivolous and supported by evidence in the record. The Board is not relying on an accretion theory to maintain that Gitano violated the Act by refusing to bargain concerning the North Brunswick employees. The validity of an

accretion theory is not relevant to the issue before this Court.

"For one year after the date of a Board certification a certified bargaining representative enjoys an irrebuttable presumption of continuing support from a majority of the employees in the bargaining unit." *N.L.R.B. v. Paper Manufacturers Co.*, 786 F.2d 163 (3d Cir.1986); *See Brooks v. N.R. L.B.*, 348 U.S. 96, 102–04, 75 S.Ct. 176, 180–82, 99 L.Ed. 125 (1954). This rule applies to cases of relocation and promotes stability in collective bargaining arrangements. Otherwise, employers could merely relocate their enterprise around the corner and defeat the underlying purposes of the NLRA. However, relocation can constitute a sufficiently "changed circumstance" which would require the Board to review its certification of an appropriate bargaining unit. *See Molded Acoustical Products, Inc. v. N.L.R.B.*, 815 F.2d 934, 940–941 (3d Cir.) *cert. denied* 484 U.S. 925, 108 S.Ct. 286, 98 L.Ed.2d 247 (1987).

The Third Circuit has stated that "[t]he factors relevant to the determination of an appropriate bargaining unit include (1) integration of operations, (2) centralization of managerial and administrative control, (3) geographic proximity, (4) similarity of working conditions, skill, and functions, (5) common control over labor relations, (6) collective bargaining history, and (7) interchangeability of employees." *Paper Manufacturers*, 786 F.2d at 167 (citing *N.L. R.B. v. Security–Columbian Banknote Co.*, 541 F.2d 135, 140 (3d Cir.1976)).

The record before the ALJ shows that both the Orit and NAU operations were in the original unit, continue to operate with the same supervision, management and equipment, and continue to be subject to centralized management and common direction of labor relations. The employees are subject to common personnel policies and have their hours, wages and benefits determined as they were before the relocation. The Edison and North Brunswick facilities are only approximately twelve miles apart. The skill levels and job functions are unchanged in the new location, with the exception that in North Bruns-

wick, NAU has added functions to its operation which had been previously performed by Orit unit employees in Edison. Gitano has precluded employee contact between the Edison and North Brunswick facilities and between the Orit and NAU operations at North Brunswick. However, the record indicates that employees at both facilities perform essentially the same functions for a centralized and integrated product distribution system.

The Court finds that sufficient evidence exists in the record to support a finding that Gitano has merely relocated a portion of an established collective bargaining unit. *See Hahn Motors, Inc.*, 283 NLRB 901, 125 L.R.R.M. 1065 (1987). It is disingenuous for Gitano to argue that the Board may not find that a relocation of an existing bargaining unit has occurred because there is currently no integration between the Edison and North Brunswick operations and "only 10 to 12 of the approximately 50 NAU employees who commenced operations at North Brunswick in January were former Edison bargaining unit employees." Opp. Br., p. 24. Both of these factors are, and were, under the direct control of Gitano and are at issue in Gitano's proceeding before the NLRB. In addition, the Court finds that sufficient evidence exists in the record for the Board to infer that, but for Gitano's lay-off of the NAU/Edison employees, the Union would have represented at least a substantial percentage of employees in North Brunswick. Gabay's asserted reliance on preliminary remarks of an undocumented amount of Edison employees that transportation might pose a problem for the employees is contradicted in the record by Gabay's acknowledgement that an employee's ability to find transportation to the North Brunswick facility has never played any part in the hiring of new employees or the recall of laid-off employees to North Brunswick. Tr. 490–91. Therefore, the Court finds that there are sufficient facts in the record to support the legal theory on which the Board relies.

### 3. Refusal of Information

There is no dispute that Gitano refused to provide the Union with the information

that it requested relating to the warehouse employees at North Brunswick. Gitano also does not dispute that the information requested would be relevant if it concerned employees in the bargaining unit. Gitano has only disputed the contention that the North Brunswick employees are part of the bargaining unit. Since this Court now holds that sufficient evidence exists to support such a finding, it follows that the refusal to provide information concerning those employees would also be a violation of the Act. Therefore, the Court finds that the "reasonable cause" requirement has been met here.

## B. *The "Just and Proper" Requirement*

■ The Court must now turn to the requirement that the relief sought be "just and proper." The Court must address the issue as to whether it is in the public interest to grant the injunction. The Court has considered the public interest in the effectuation of the policies of the NLRA or the promotion of the remedial function of the Board. The Court concludes that the relief sought by the petitioner in this instance is "just and proper."

The Board presents this Court with "the basic theory ... that denial of reinstatement effectively denies employees the fruits of the collective bargaining process that otherwise would be available to them prior to ultimate reinstatement." *Kobell,* 731 F.2d at 1093. Specifically, the Board contends that interim reinstatement of the laid off NAU/Edison employees who were denied transfer to the North Brunswick facility, or recall to the Orit/Edison operation, is vital if the Union is ever going to be able to effectively exercise the unit members' § 7 rights. The Board contends that the discharge of the most senior employees, particularly twelve who had been a part of the 1987 unfair labor practice strike, was intended to and in fact did send a message to current employees concerning Gitano's attitude toward the Union, and the NLRB. The Court agrees that the evidence before the ALJ supports the finding that the actions of Gitano have impacted on the support for the Union among unit employees. In the absence of injunctive re-

lief, many unit employees will lose confidence in the Union's ability to come to their aid. The Court agrees with the Board's contention that injunctive relief is necessary in this instance to preserve the integrity of the collective bargaining process pending a final resolution of the unfair labor practice charges before the NLRB. The Third Circuit has indicated that in similar situations there is a "presumption ... that ultimate reinstatement is unlikely to vindicate the remedial powers of the Board." *Kobell,* 731 F.2d at 1093, discussing the holding in *Eisenberg v. Wellington Hall Nursing Home,* 651 F.2d 902 (3d Cir. 1981). For example, in this instance, absent injunctive relief, by the time the Board renders its decision, many employees may be forced to accept employment elsewhere and will therefore be unable or unwilling to return to their former jobs should reinstatement be ordered. Similarly, the reduction of union participation in the collective bargaining process through lay-offs and relocation greatly reduces the confidence of employees in the Union's ability to challenge their employer. The Board's order would therefore come too late to have any meaningful effect to these people.

■ Accordingly, injunctive relief is just and proper in this instance because the failure to grant such may irreparably harm the collective bargaining efforts of the Union at respondent's Edison and North Brunswick facilities and the strength of the employees confidence in the collective bargaining process. A denial of injunctive relief in this instance would only serve to further Gitano's alleged violations and would not give effect to the purposes of the Act. The statutory rights of the alleged discriminatees to reinstatement outweighs the job rights of the new North Brunswick employees. The predominant focus under § 10(j) is the harm to the bargaining process and not the harm to individual employees. *Kobell,* 731 F.2d at 1093. Injunctive relief is clearly necessary here to "preserve the integrity of the collective bargaining process." *See Eisenberg v. Wellington Hall Nursing Home,* 651 F.2d 902.

An interim bargaining order is also just and proper relief in this situation. The Court has found that the record contains evidence that the Board has reasonable cause to believe that Gitano's refusal to bargain with the Union over North Brunswick employees constitutes an unlawful withdrawal of recognition. The Court finds that the failure to negotiate with the Union concerning a significant portion of Gitano's operations within the presumed certified bargaining unit is a serious impediment to the collective bargaining process at this stage of the employer-union relationship. Without interim relief, some or all of the unit employees will be denied the benefits of good faith collective bargaining for the period of time required for a final Board determination. The Court notes that Gitano may insist as a condition of reaching agreement under the § 10(j) injunction that any labor contract covering the North Brunswick facility be contingent on the Board upholding its asserted unit determination. Thus, on balance, the burden to Gitano in having to bargain in good faith concerning the employees in North Brunswick does not exceed the harm which the current situation creates for the perception of the remedial powers of the Board and the effectuation of the purposes of the NLRA. The Court's determination concerning the reasonable cause requirement of the unit determination issue encompasses a discussion of the § 7 rights of the current employees in North Brunswick because of the presumption of Union majority after certification in an appropriate bargaining unit. Because the Court has found sufficient evidence to support the Board's theory that the North Brunswick employees are part of the certified bargaining unit, their § 7 rights have been exercised for the purposes of the instant action. Also, the circumstances of this action warrant the issuance of a broad § 8(a)(1) "in any other manner" cease and desist order.

### III. CONCLUSION

For the above stated reasons, the Court finds that reasonable cause to believe that a violation of the NLRA exists and that injunctive relief would be just and proper to effectuate the purposes of the NLRA. Therefore, the Board's petition for injunctive relief pursuant to § 10(j) will be granted. The Court will issue an order requiring Gitano, pending final adjudication by the Board of the instant charges, to cease and desist from:

(1) laying off, refusing to transfer, or otherwise discriminating against employees because of their union membership, activities, or support;

(2) failing, or refusing to recognize and bargain in good faith with the Union as the exclusive collective bargaining representative of Gitano's warehouse employees in the Edison and North Brunswick facilities;

(3) failing or refusing to promptly provide the Union with requested information which is relevant and necessary to the collective bargaining process; and

(4) in any other manner interfering with, restraining, or coercing its employees in the exercise of their statutory rights.

The Court will also order Gitano to:

(1) offer interim reinstatement to the former NAU/Edison employees remaining on lay-off from the Edison facility to their former, or substantially equivalent positions, without prejudice to their former seniority or other rights and privileges. Such reinstatement may be to positions in North Brunswick or in Edison, displacing, if necessary, newly hired employees at the North Brunswick facility;

(2) recognize and, on request, bargain in good faith with the Union as the exclusive bargaining representative of warehouse employees at the Edison and North Brunswick facilities;

(3) promptly provide the Union, on their request, with relevant and necessary information for the purpose of collective bargaining;

(4) post copies of the Court's Opinion and the Court's Order, in both English and Spanish, at the Edison and North Brunswick locations, where notices to employees are customarily posted; and

(5) within thirty days of the entry on the docket of the Court's Order, submit to

the Court, with a copy to all parties, an affidavit from a responsible official of Gitano describing the specific actions taken by Gitano to comply with the Court's order.