Dorothy L. MOORE–DUNCAN, Regional Director of the Fourth Region of the NATIONAL LABOR RELATIONS BOARD, for and on behalf of the National Labor Relations Board, Petitioner,

v.

**HORIZON HOUSE DEVELOPMENTAL SERVICES, Respondent.**

No. Civ.A. 01–CV–1365.

United States District Court, E.D. Pennsylvania.

June 19, 2001.

William E. Slack, Jr., National Labor Relations Board, 4th Region, Philadelphia, PA, Edward J. Bonett, Jr., National Labor Relations Board, Fourth Region, Philadelphia, PA, for petitioner.

Guy Vilim, Gold & Vilim, Philadelphia, PA, for respondent.

## *MEMORANDUM*

TUCKER, District Judge.

Petitioner Dorothy L. Moore–Duncan, Regional Director of the National Labor Relations Board, has petitioned the Court for a preliminary injunction against re-

spondent Horizon House Developmental Services, requiring Horizon House to bargain in good faith with District 1199C, National Union of Hospital and Health Care Employees ["the union"] as the representative for a unit consisting of resident advisors employed at respondent's Bucks County facilities. For the following reasons, the Court will issue a preliminary injunction.

## I. BACKGROUND

Respondent operates group homes for mentally retarded and mentally ill individuals in Bucks and Philadelphia Counties, Pennsylvania. The union's representative for the Horizon House unit, Maureen Bendig, and the human relations director for Horizon House, Rita Kuscan, agreed in their in-court testimony that at all relevant times, the bargaining unit contained between twenty and twenty-three resident advisors, who worked different shifts at the several group homes in Bucks County. The union was certified as the exclusive bargaining agent for the unit in 1997, and respondent and the union negotiated a contract which expired on September 30, 2000. Ms. Bendig contacted several management employees at Horizon House between May and September 2000 in order to arrange for negotiations on a new contract, but respondent never agreed to negotiate. On October 2, 2000, respondent notified the union that it would not negotiate with the union, and on October 16, 2000, respondent filed a petition with the N.L.R.B. for a union election, stating that it believed that the union no longer enjoyed majority support among its members in the unit. Separately, the union filed unfair labor practice charges against respondent, alleging that respondent was illegally refusing to bargain with the duly certified representative of the employees in the bargaining unit. Respondent's petition for a union election was dismissed in February 2001. The N.L.R.B., in its capacity as the enforcement agent with responsibility for litigating in the federal courts to protect the collective bargaining process [henceforth "the Board"], filed this petition on March 22, 2001.[1]

## II. LEGAL STANDARD

■ Section 8(a) of the National Labor Relations Act ["the Act"] provides that it is illegal for employers "to interfere with, restrain or coerce employees in the exercise of" their right to engage in, or refuse to engage in, concerted labor activity, or "to refuse to bargain collectively with the representative of his employees.". 29 U.S.C. § 158(a)(1), (5). Section 10(j) of the Act provides that, after an administrative complaint has been issued alleging the commission of unfair labor practices in violation of Section 8(a), the Board may seek temporary injunctive relief in the United States District Court. 29 U.S.C. § 160(j). The Court, in considering whether to grant an injunction, must make two determinations: whether there is reasonable cause to believe that an unfair labor practice has occurred, and whether an injunction would be just and proper. *See Hirsch v. Dorsey Trailers, Inc.,* 147 F.3d 243, 247 (3d Cir. 1998).

■ In assessing whether the Board has shown reasonable cause for the issuance of an injunction, the Court should not

---

1. Respondent complains that the Board took over five months to file a complaint in federal court, thus belying any suggestion that an injunction is urgently needed. The Board routinely takes several months to file complaints in 10(j) cases, *see Pascarell v. Vibra*

*Screw, Inc.,* 904 F.2d 874, 881 (3d Cir.1990), and a six-month delay has been held not too long for the Board to investigate, deliberate, and then come to court to seek an injunction preserving the status quo ante, *see id.* at 881–82.

determine the ultimate merits of the case against the respondent, which is the role of the N.L.R.B. *See Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1083 (3d Cir. 1984). Rather,

> a district court need make one of two findings before denying relief. It must find there to be no legal theory implicit or explicit in the regional director's argument that is substantial and not frivolous. Alternatively, the district court must find insufficient evidence—at least taking the facts favorably to the Labor Board—to support any non-frivolous theory appropriate to the case at bar.

*Suburban Lines*, 731 F.2d at 1084. If the evidence might be construed to support more than one inference, the Court should construe the evidence in the light most favorable to the Board. *See Pascarell v. Vibra Screw, Inc.*, 904 F.2d 874, 877 n. 3 (3d Cir.1990).

The Court must also determine whether temporary injunctive relief would be just and proper. For this prong of the test, the Board is not required to show irreparable harm or a likelihood of success on the merits. *See Suburban Lines*, 731 F.2d at 1078. Rather, an injunction is just and proper when the Court finds that the passage of time reasonably necessary for the Board to adjudicate the case on the merits might dissipate the effective exercise of the N.L.R.B.'s powers. *See Dorsey Trailers*, 147 F.3d at 247; *Suburban Lines*, 731 F.2d at 1090–91.

## III. DISCUSSION

### A. Reasonable Cause

■ An employer may lawfully refuse to bargain with a certified bargaining agent if it has a good-faith doubt, based on a sufficiently objective basis, of continued support of the union by a majority of the bargaining unit. *See Allentown Mack Sales & Service v. N.L.R.B.*, 522 U.S. 359,

364–65, 118 S.Ct. 818, 822, 139 L.Ed.2d 797 (1998). Respondent concedes that it refused to bargain, and it concedes that the Board's legal theory in this case, that Horizon House lacked a good-faith doubt of majority support for the union and therefore acted illegally when it refused to bargain, is substantial and non-frivolous. Respondent asserts, however, that the Board does not have the facts it needs to prove its case. Respondent stresses that the employer need not be able to demonstrate conclusively the absence of majority support, but rather must be able to demonstrate an objective basis for an uncertainty which it holds in good faith. In the instant case, respondent points to several pieces of evidence which, it asserts, suffice to establish a sufficient basis for a good-faith doubt in the continued majority support for 1199C.

■ Respondent's emphasis on its own evidence would misplace the Court's focus in a proceeding on a petition for a preliminary injunction under Section 10(j). Here, the Court's duty is to determine whether the Board can identify sufficient evidence from which a factfinder could reasonably agree with its theory that the employer did not have a good-faith doubt of continued majority support for the union. *See Suburban Lines*, 731 F.2d at 1084. Even if respondent can point to other evidence which would support a contrary inference, the Court's focus remains on the question of whether the Board has met its "low threshold of proof", *Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 905 (3d Cir.1981), and produced evidence which would allow a factfinder to determine that the Board's theory was correct. Furthermore, the Court must construe the evidence in the light most favorable to the Board, *see Vibra Screw*, 904 F.2d at 877 n. 3.

Here, the Board has met its burden of proof. While Horizon House noted in its October 2000 petition for a union election that it was relying, inter alia, on sparse attendance at a union meeting on August 10, 2000, it failed to note attendance by eight or ten employees, a significant percentage of the total unit, at another union meeting in late August 2000. (Hearing before A.L.J. Bruce Rosenstein, May 9, 2001, Transcript at 32 – 34) Horizon House also noted that some employees declined union representation at grievance hearings or disciplinary interviews during 2000, but at least two such employee, Karen Diyenno and Lucy Morrison, indicated to their supervisor that they did want union representation, and only agreed to proceed without it out of frustration at their inability to contact someone at the union to request representation. (T. 147–52) A factfinder could determine that the fact that these employees declined to insist upon representation on some occasions does not prove that they had no interest in any of the services of the union, much less that they no longer wanted the union to serve as their bargaining agent for contract negotiations.

The company also informed the N.L.R.B. that it doubted the union's continued majority because Traci Thompson, a union member and former union delegate, told Horizon House representatives in the spring of 2000 that employees did not want the union and that they would file a petition to have the union removed as their representative. (T. 93) The Board points out that a factfinder could take note of the facts that respondent cannot identify any other direct comments from employees expressing a desire to be rid of the union, and, most tellingly, no employee petition for decertification of the union was ever processed by the N.L.R.B., even though Thompson said that she had accidentally mailed it to the union rather than to the N.L.R.B., thereby indicating her awareness of the correct recipient for decertification petitions. (T. 136) Thompson herself, despite her comments, volunteered to be on the union's contract negotiation committee. (T. 33) These facts, also, could be construed to suggest that Horizon House's expressed doubts of the union's continuing majority were not founded on firm evidence, and were not in good faith.

The Board has also presented evidence to suggest that Horizon House was unlawfully seeking to thwart the union in its exercise of responsibility for the interests of unit employees by failing to provide the union with relevant information and refusing to process grievances. In August 2000, Bendig asked Horizon House for the identity and wage rates of unit employees, their number of hours worked, the cost of their health insurance benefits, and a copy of the leave policy applied to them, but respondent did not provide the information in a timely fashion. (T. 17–19) Subsequently, Bendig filed grievances concerning certain work conditions, and on September 6, she asked Kuscan by telephone to arrange a meeting concerning the grievances, but Kuscan, despite a promise to meet, never made the necessary arrangements. (T. 19–26) A factfinder could conclude from these facts that Horizon House had bad faith motives, was trying to prevent the union from serving its members effectively, and was looking for an excuse to get rid of 1199C.

■ Furthermore, respondent's affirmative evidence is not so overwhelming or conclusive that a factfinder could not reasonably find against it. Respondent notes that some employees failed to pay union dues, but a refusal to pay union dues, especially by workers in a comparatively low wage job such as resident advisors in group homes, does not necessarily suggest

that such workers are opposed to the union's continued role as their bargaining representative, *see Retired Persons Pharmacy v. N.L.R.B.*, 519 F.2d 486, 490 (2d Cir.1975). The issue is not whether all of the employees pay dues, but whether a majority of them desire representation, *see N.L.R.B. v. Wallkill Valley Gen. Hosp.*, 866 F.2d 632, 637 (3d Cir.1989) (citing *Retired Persons Pharmacy*, 519 F.2d at 491). In particular, Barbara Rossi, the coordinator of two of the Bucks County sites, testified that one of the people who complained about having to pay union dues was Tenisha Moore, yet Moore specifically requested the union's involvement at subsequent disciplinary proceedings. (T. 154, 178)

Respondent also points out that the union did not replace Traci Thompson when she resigned as the union delegate, but reluctance to take on leadership positions requiring possible commitments outside of work hours, like reluctance to attend a single union meeting on a given day, can obviously be caused by many factors aside from dissatisfaction with the union. Workers may simply have been too tired or otherwise committed. A factfinder, viewing all of the evidence, could conclude that respondent's basis for its conclusion that the union lacked support was weak and circumstantial, and that petitioner's evidence demonstrate a lack of good faith on respondent's part.

B. Just Cause

 Petitioner has also adduced evidence sufficient to demonstrate that an injunction would be in the public interest. An injunction is just and proper when the Court finds that the passage of time reasonably necessary for the Board to adjudicate the case on the merits might dissipate the effective exercise of the N.L.R.B.'s powers. *See Dorsey Trailers*, 147 F.3d at 247; *Suburban Lines*, 731 F.2d at 1091.

> The critical determination is whether, absent an injunction, the Board's ability to facilitate peaceful management-labor negotiation will be impaired... This requires an assessment of "the likelihood of harm to the bargaining process" absent an injunction.... Unless there are circumstances, like the size, intimacy and longevity of the bargaining unit, which indicate that the bargaining process will not be harmed, courts must be deferential to the Board's determination that the integrity of the process needs interim protection.

*Dorsey Trailers*, 147 F.3d at 247 (citations omitted).

 The bargaining process is harmed when an employer's actions weaken a union, and that union's ability to provide effective representation is diminished. If the union cannot negotiate for better terms and conditions of employment, the interest of the employees in representation will dissipate. The impotence of the union and the loss of employee interest can create a mutually reinforcing cycle, as a lack of support among employees further diminishes the union's strength and, consequently, its ability to press for improvements that would demonstrate its worthiness to the members of the bargaining unit. If negotiations are eventually ordered by the N.L.R.B. at the end of the administrative process, a union which has been weakened in the interim by the employer's actions will be hard-pressed to secure improvements in wages and benefits at the bargaining table. *See N.L.R.B. v. Schill Steel Products, Inc.*, 480 F.2d 586, 590 (5th Cir.1973); *International Union of Elec., Radio and Mach. Workers, AFL-CIO v. N.L.R.B.*, 426 F.2d 1243, 1249 (D.C.Cir.1970). An interim injunction requiring that the employer bargain in good

faith may be therefore be necessary to prevent irreparable damage to the union's position and to the bargaining process. *See Dorsey Trailers,* 147 F.3d at 247.

The Third Circuit has recognized an exception to the general rule of deference to the Board's determination that an injunction would be just and proper. If the alleged unfair labor practice "is against an established, 'small and intimate' bargaining unit, improper attempts by management to impair the collective bargaining process will have minimal 'chilling' effect because the employees will, most likely, be fully aware of their rights under the NLRA." *Vibra Screw,* 904 F.2d at 879.

In the instant case, the bargaining unit is small—only twenty to twenty-three members at any tim—but there are other reasons to predict that management's refusal to bargain will have a chilling effect on employee's support for the union. Kuscan testified in court that the turnover rate of employees in the bargaining unit was forty percent to fifty percent per year, and that less than a third of the workers presently in the unit were employed at the time of the union-led contract negotiations in 1997. The Court cannot presume that brand-new and frequently replaced employees "will, most likely, be fully aware of their rights under the NLRA."

Moreover, the unit is not intimate at all. The workers are scattered among several different group homes in Bucks County. Bendig testified under cross-examination that workers could communicate with one another by leaving notes for workers on different work shifts; the union representative cannot discuss union matters with the employees on site during work hours. Brand-new and frequently replaced workers who are employed at different work sites and must communicate by leaving notes for one another are obviously not members of an "intimate" unit. Addition-

ally, the union to which they belong is not well established at Horizon House, as it has only conducted one contract negotiation since it was certified as the bargaining agent.

In this situation, the passage of time before an administrative resolution of the complaint would hamper the effective exercise of the N.L.R.B.'s powers, because the union's continued inability to negotiate on behalf of the employees is likely to damage the union's position, and ultimately to limit the union's ability to negotiate effectively if the N.L.R.B. should order negotiations. An injunction here will temporarily restore the parties to their respective situations prior to respondent's allegedly unlawful behavior. Respondent protests that it is not taking steps to alter the current situation and that the Court should not enter an order that would change the status quo, but "the relevant status quo" which a 10(j) injunction is intended to preserve "is not the situation as it was right before the Board filed its petition, but the situation as it was right before the alleged unfair labor practices took place." *Vibra Screw,* 904 F.2d at 878 n. 5. An interim bargaining order should not impose significant burdens on respondent, because any contract can be made subject to recission in the event that the N.L.R.B. should dismiss the complaint and determine that the Company acted lawfully. *See Pascarell v. Gitano Group,* 730 F.Supp. 616, 625 (D.N.J.1990).

## IV. CONCLUSION

The Court finds that there is reasonable cause to believe that respondent has committed an unfair labor practice, and that a temporary injunction requiring the parties to bargain in good faith would be just and proper. An injunction is necessary here to preserve the integrity of the collective bar-

gaining process. The Court will enter an appropriate injunction.

### PRELIMINARY INJUNCTION

AND NOW, this 18th day of June, 2001, upon consideration of Petitioner's Petition for Injunction Under Section 10(j) of the National Labor Relations Act, As Amended (Doc. #1), filed March 22, 2001, and Respondent's Answer thereto, for the reasons set forth in the accompanying Memorandum, it is hereby **ORDERED** that Petitioner's Petition is GRANTED.

Respondent, Horizon House Developmental Services, Incorporated, its officers, representatives, agents, servants, employees, attorneys, successors, and assigns, and all persons acting in concert or participation with it or them, is directed, pending final disposition of the matters involved herein pending before the National Labor Relations Board ["the Board"], to:

1. On an interim basis, recognize District 1199C, National Union of Hospital and Health Care Employees, AFSCME, AFL—CIO ["the Union"] as the exclusive bargaining representative of the Resident Advisors II and III in Respondent's Bucks County, Pennsylvania Division, and promptly commence good-faith negotiations with the Union concerning the terms of a new collective bargaining agreement;

2. On an interim basis, furnish to the Union, without delay, information relevant to collective bargaining or grievance adjustment requested in the Union's August 14, 2000 letter to Rita Kuscan and its August 30, 2000 facsimile transmission to Robert Lindsey, and, upon the Union's request, furnish any other information that is relevant and necessary to the Union's performance of its duties as the exclusive collective bargaining representative of the Unit;

3. On an interim basis, promptly process the grievances filed by the Union concerning (a) supervisors performing bargaining unit work; (b) employees not being paid overtime; and (c) failure to post work schedules, and any other grievances the Union files on behalf of Unit employees;

4. Post a copy of this Order and the accompanying Memorandum at Respondent's offices at 120 South 30th Street, Philadelphia, Pennsylvania, at its Bucks, County, Pennsylvania facilities (community living arrangements) where Unit employees work, and in all locations where Respondent's notices to employees are customarily posted; maintain these postings during the Board's administrative proceeding free from all obstructions and defacements; and grant to agents of the Board reasonable access to its facilities to monitor compliance with this posting requirement; and

5. Within twenty (20) days of the date of this Order, serve upon the Court and Petitioner a sworn affidavit from a responsible Respondent official which states with specificity the manner in which Respondent has complied with the terms of this Order.